34

748 A.2d 166

COMMONWEALTH of Pennsylvania, Appellee,

v.

Richard YOUNG, Appellant.

Supreme Court of Pennsylvania.

Argued Feb. 4, 1998.

Resubmitted May 19, 1999.

Decided Jan. 22, 1999.

On Reargument March 24, 2000.

36

38

44

46

Enid W. Harris, Wilkes Barre, Billy H. Nolas, Robert Brett Dunham, Philadelphia, for Richard Young.

Michael J. Barrasse, Scranton; Amil M. Minora; Amy A. Shwed, Scranton, for the Com.

Robert A. Graci, Harrisburg, for Office of Atty. Gen.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## OPINION

NEWMAN, Justice.

Richard Young (Appellant) appeals from the Judgment of the Court of Common Pleas of Lackawanna County (trial court) sentencing him to death on his conviction for first degree murder. Appellant raises a plethora of issues concerning both the guilt phase and the penalty phase of the trial. For the reasons discussed herein, we affirm Appellant's conviction, but reverse the death sentence and remand for a new sentencing hearing.

## FACTUAL AND PROCEDURAL HISTORY

On March 21, 1979, F.B.I. Agent Daniel Glasgow (Agent Glasgow) interviewed Russell Loomis (Loomis) concerning a fraud scheme involving Appellant, William Slick (Slick), George Cornell (Cornell), Ronald Hull (Hull), and others. Loomis gave Agent Glasgow a statement outlining what Glasgow described as a "break out" or "bust out" scheme, whereby Appellant and his co-conspirators would fraudulently obtain merchandise on credit, avoid paying for the goods by concocting a story about it being lost or destroyed, and then sell the merchandise to a fence, or to the public from a discount store. Loomis agreed to testify before a federal Grand Jury investigating Appellant's bust out scheme.

Loomis disappeared several days before he was scheduled to testify before the Grand Jury. Theresa Slick, Loomis' live-in girlfriend, testified that she last spoke with Loomis at about six o'clock on the evening of April 11, 1979, at Appellant's discount store, where Loomis worked. Loomis told her and others that he had to go with Appellant to retrieve a jeep that was stuck in mud in the woods and that he would be home late. He never returned.

On the morning of April 14, 1979, two fishermen found Loomis' body in a remote area of Lackawanna County, wedged between some debris in a creek called Painter's Creek. Near the body they found a shovel and a come-a-long (a hand operated wrench), which were later identified as

having come from Appellant's discount store. A short distance away, there was an old foundation with a recently dug rectangular hole about the size of a grave. An autopsy revealed that Loomis had three bullet wounds one entered his back and exited his chest area; one entered his forehead near the left scalp line and lodged at the base of his skull in the rear; and the third entered his lower left lip area in an upward direction, exiting below his right eye.

Shortly after the murder, police interviewed Hull, and he denied any knowledge of the killing. Appellant was arrested in December of 1980 on charges related to the bust out scheme, but fled while free on bail. After Appellant fled, police interviewed Hull again, and he again denied any knowledge of the murder. The police also interviewed Slick and Cornell, both of whom gave statements implicating Appellant and Hull in Loomis' murder. Cornell also told police that he helped Appellant dispose of a jeep in New York City, and that he had supplied Appellant with a .357 caliber gun, the same caliber as Loomis' bullet wounds.

In 1981, police took the statement of Andrew Halupke (Halupke), another co-conspirator in the bust out scheme. At that time, Halupke told police that on April 8, 1979, three days before Loomis disappeared, he and Hull participated in the planning of Loomis' murder by searching for a place where they would be able to dispose of Loomis' body. According to Halupke, Appellant wanted them to dig a grave where Loomis would never be found.

In 1991, police again spoke to Hull, and this time he admitted to participating in Loomis' murder. At first, Hull denied being present at the scene of the murder, but later admitted to being there with Appellant, Cornell, and Paul Nemish. Hull later retracted that statement and told police that Nemish was not present at the murder scene, but Slick was. Hull eventually agreed to testify against Appellant and his co-conspirators.

Before a Grand Jury investigating the Loomis murder, Hull testified that on April 11, 1979, he, Appellant, Slick, and

Cornell lured Loomis into the woods by telling him that they needed help retrieving a jeep that was stuck in the mud. When they arrived at Painter's Creek, Loomis began to walk across a fallen log that was acting as a bridge over the creek, and Appellant shot him in the back. Loomis turned around and attempted to walk back toward Appellant, but Cornell grabbed the gun and shot Loomis a second time. Loomis fell, and Cornell shot him again. Hull, Appellant, and Slick tried to pull Loomis' body off the log and put it in the grave, but they were unable to extricate it from the debris in the creek, so they left the body where it was. Slick drove away in the jeep, and the others drove away in Loomis' car, a green Ford LTD.

Hull testified that the undercarriage of the car was damaged as they were leaving the Painter's Creek area, so they stopped to fix it on Route 502 in Springbrook Township, Lackawanna County. Harold Litts, who owned a gas storage tank near where the co-conspirators stopped, saw the jeep and the LTD and became suspicious. He drove past the stopped vehicles, and then turned around and drove past them in the opposite direction, seeing two individuals whom he later identified as Appellant and Slick.

After the LTD was fixed, Hull drove it to the parking lot of the Wyoming Valley Mall in Wilkes–Barre, Pennsylvania. Appellant's brother-in-law picked up Hull and took him to Appellant's parents' home, where they met Appellant and Cornell. They disassembled the murder weapon and threw the parts into the Susquehanna River, and Appellant told Hull and the others not to discuss the murder with anyone.

In March of 1992, the Grand Jury indicted Appellant, Slick, and Cornell for Loomis' murder. The three co-defendants were tried together, and, on September 6, 1995, a jury found Appellant guilty of first degree and third degree murder, 18 Pa.C.S. § 2502(a) and (c), respectively. At the penalty hearing, the jury found one aggravating circumstance, that Appellant had killed Loomis to prevent him from testifying before the federal Grand Jury investigating Appellant's bust out

scheme, and they found no mitigating circumstances. Accordingly, the trial court sentenced Appellant to death.

## DISCUSSION

Appellant raises a multitude of issues in this appeal, challenging aspects of both the guilt phase and penalty phase of his trial. We address the issues seriatim.

### A. GUILT PHASE

#### 1. SUFFICIENCY OF THE EVIDENCE

■ Appellant first argues that there was insufficient evidence to convict him of Loomis' murder because Hull, the only witness who implicated Appellant directly, gave conflicting testimony that was unreliable as a matter of law. Appellant argues that because Hull gave the police numerous inconsistent accounts of his participation in Loomis' murder, made statements at trial that conflicted with earlier statements, and was easily led by the prosecutor, Hull's entire testimony, and the Commonwealth's entire case, should be disregarded.

Appellant's argument is flawed for several reasons. First, he fails to acknowledge that there was substantial evidence against him independent of Hull's testimony. At trial, Harold Litts identified Appellant as one of the men he saw on Route 502 on the night of the murder, and Andrew Halupke testified that he and Hull helped Appellant plan the murder by looking for a place to dispose of Loomis' body. Second, Hull's testimony was corroborated by that of Litts and Halupke, and by the physical evidence, e.g., the location and position of Loomis' body, the location of the grave, the presence of the shovel and come-a-long from Appellant's store, and the location of Loomis' car in the parking lot of the Wyoming Valley Mall. Finally, there was additional circumstantial evidence of Appellant's guilt, including his attempt to alter his fingerprints.[1] In short, the totality of the evidence against Appellant, both direct and circumstantial, was more than sufficient to sustain Appellant's conviction for first degree murder.

1. *See* Guilt Phase Issue 11, *infra.*

## 2. ALLEGEDLY INCONSISTENT VERDICTS

Appellant next argues that the trial court erred in molding the jury's verdicts of guilty on the charges of first degree murder and third degree murder into a conviction for first degree murder. He argues that the two verdicts are legally inconsistent, because the conviction for first degree murder requires a finding that Appellant had a specific intent to kill, while the conviction for third degree murder requires the opposite finding that Appellant did not have a specific intent to kill. This, however, is an incorrect statement of the law.

Contrary to Appellant's assertion, third degree murder is not a homicide that the Commonwealth must prove was committed with malice and without a specific intent to kill. Instead, it is a homicide that the Commonwealth must prove was committed with malice, but one with respect to which the Commonwealth need not prove, nor even address, the presence or absence of a specific intent to kill. Indeed, to convict a defendant for third degree murder, the jury need not consider whether the defendant had a specific intent to kill, nor make any finding with respect thereto. Thus, there is no inconsistency in the jury's convicting Appellant of both first and third degree murder.

### 3. ALLEGEDLY IMPROPER EX PARTE COMMUNICATIONS WITH JURORS

Appellant argues that two instances of *ex parte* communications between the trial court and certain jurors entitle him to a new trial. Pursuant to *Commonwealth v. Elmore*, 508 Pa. 81, 494 A.2d 1050, 1051–52 (1985), where there has been *ex parte* contact between the court and jury in a criminal case, we are constrained to reverse the defendant's conviction unless there is no reasonable possibility that the error might have contributed to the conviction. Thus, we analyze each of the two instances according to the *Elmore* standard.

#### a. *Juror's attempt to be excused from service*

After the jury had been empaneled, but prior to trial, a juror (Juror One) contacted the Court Administrator and

requested to be excused from service. The Court Administrator advised the trial court of Juror One's request, and the court instructed the Administrator to inform Juror One that he would not be excused.

Subsequently, Appellant's standby counsel overheard Juror One discussing with another juror (Juror Two) how to evade jury duty. Standby counsel brought the incident to the attention of the trial court, and the court held a hearing to question standby counsel and the two jurors. At the hearing, which Appellant did not attend, the court questioned the jurors in detail about their conversation, and determined that Juror Two could not evaluate the merits of the case impartially. Accordingly, the court dismissed Juror Two. The court found that Juror One's reasons for seeking to be excused had nothing to do with the merits of the case and that he could be impartial. Thus, the court declined to dismiss him.

Although Appellant argues that, as a result of the trial court's *ex parte* contact with Juror One, "the conclusion that Appellant suffered prejudice is inescapable," there is absolutely no evidence to support that conclusion. Absent any indication that Juror One was biased against Appellant or his counsel, or that Juror One's communications with the trial court had some effect on his or other jurors' decision to convict Appellant, we have no basis on which to find a reasonable possibility of prejudice. *Cf. Commonwealth v. Winstead,* 377 Pa.Super. 483, 547 A.2d 788 (1988), *alloc. denied,* 524 Pa. 620, 571 A.2d 382 (1989) (conviction affirmed where appellate court could not discern any prejudice from juror's *ex parte* contact with prosecutor). Accordingly, we will not reverse Appellant's conviction because of the *ex parte* contact of the trial court with Juror One.

### b. *Juror's dismissal during trial*

On August 28, 1995, approximately two weeks after the start of trial, the court dismissed a juror (Juror Three) pursuant to an agreement with the parties to excuse Juror Three if the trial extended beyond August 25, 1995. Although

Appellant denies the existence of such an agreement, the record reflects otherwise:

> TRIAL COURT: At the individual voir dire, at which time the attorneys and the litigants were present, we had indicated to [Juror Three] that we would excuse him as of August 25th in the event that the trial did not conclude at that time. He had stated that he had made arrangements to have a vacation with his family first beginning on August 21 and he postponed it a week but he could not postpone it any longer. And we did represent to him that he would be excused at that time. I'm sure counsel would recall that.
>
> APPELLANT'S
>
> COUNSEL: I recall it, but I object to excusing a juror at this stage of the trial. . . .

(N.T., 8/28.95, pp. 3–4). Appellant's trial counsel plainly acknowledged the existence of the agreement to dismiss Juror Three. Furthermore, there is no evidence that the court had any *ex parte* contact with Juror Three. Accordingly, no relief is due.

### 4. ADMISSION OF HEARSAY EVIDENCE

Appellant argues that the trial court erred in admitting various testimony and documents that constituted hearsay. We discuss each item as follows:

#### a. *Loomis' statement to Agent Glasgow*

At trial, Agent Glasgow read into the record his written report of Loomis' statement regarding the bust out scheme, in which Loomis implicated Appellant and others. Agent Glasgow's report, however, was not offered to prove that Appellant was involved in the bust out scheme, but to establish Appellant's motive for killing Loomis, i.e., to prevent him from cooperating with the FBI and testifying against Appellant before the federal Grand Jury. Accordingly, it was not excludable hearsay. *See, e.g., Commonwealth v. Griffin,* 511 Pa. 553, 515 A.2d 865 (1986).

54

### b. *Agent Glasgow's testimony regarding Lou Masgay*

Agent Glasgow also testified that he received information from Lou Masgay, a fence, from which he could estimate that the value of the goods acquired in the bust out scheme was approximately one million dollars. Like Loomis' statement, this testimony was not offered to prove the truth of the matter asserted, but to establish motive. Accordingly, it was properly admitted.

### c. *Complaints made to law enforcement authorities*

Agent Glasgow testified that he began investigating the bust out scheme, and ultimately came into contact with Loomis, after receiving complaints that Appellant and others were involved in fraudulent activity. While this testimony may have gone beyond the limits of permissible explanation of police conduct, *see, e.g., Commonwealth v. Palsa,* 521 Pa. 113, 555 A.2d 808 (1989), it was merely cumulative of other evidence concerning the bust out scheme, and had no effect on the jury's verdict. Accordingly, any error in admitting the testimony was harmless. *See Commonwealth v. Story,* 476 Pa. 391, 383 A.2d 155 (1978).

### d. *Slick's and Cornell's statements*

Slick and Cornell, Appellant's co-defendants, both exercised their Fifth Amendment privilege not to testify at the joint trial. The trial court, however, admitted into evidence statements Slick and Cornell made to Agent Glasgow and State Police Trooper Nicholas Genova (Trooper Genova) in January, February, and March 1981. In these statements, Slick and Cornell recounted their involvement with Appellant and others in the bust out scheme and in the planning and cover-up of Loomis' murder. Appellant argues that the co-defendants' statements should have been excluded as hearsay, and as a violation of Appellant's right to confrontation as expressed in *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). These arguments fail.

■ Pennsylvania recognizes an exception to the hearsay rule for an unavailable declarant's statements against interest. *See, e.g., Commonwealth v. Colon,* 461 Pa. 577, 337 A.2d 554 (1975). Because they exercised their Fifth Amendment privilege against self-incrimination, Slick and Cornell were unavailable to testify. Their statements implicated themselves, as well as Appellant and each other, in the bust out scheme and in Loomis' murder, and, therefore, were plainly against their respective penal interests. Therefore, the statements were admissible.

With respect to the confrontation issue, the United States Supreme Court in *Dutton v. Evans,* 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970), held that a statement that came within an exception to the hearsay rule would not violate the Confrontation Clause if it had sufficient "indicia of reliability." *See also Commonwealth v. Coccioletti,* 493 Pa. 103, 425 A.2d 387 (1981). Here, Slick's and Cornell's statements had ample indicia of reliability because they were corroborated by Hull, Halupke, and each other. Accordingly, Appellant's right to confrontation was not violated.

### e. *Loomis' statement to State Police Trooper Golden*

■ At trial, Trooper Golden testified to various statements that Loomis had made to him about Appellant. Loomis told Trooper Golden that he was afraid of Appellant; that Appellant had told him that he was in the "Richard Young Mafia" for life, and so was his family; and that he was afraid that Appellant would harm his family if he cooperated with the police and testified against Appellant. Like Loomis' statements to Agent Glasgow, these statements were not offered for the truth of the matter asserted, but to establish Appellant's motive for killing Loomis. Accordingly, they were admissible.

### f. *Loomis' statements to Theresa Slick and others*

■ Theresa Slick, Loomis' girlfriend, testified that Loomis told her that he was talking to the police about Appellant and he was "afraid something would happen" if

Appellant discovered what he was doing. Again, these statements went to motive, and, therefore, were admissible. Theresa Slick and others testified that, on the day before the murder, Loomis told them that he was going with Appellant to retrieve a jeep that was stuck in the mud. These statements were admissible as evidence of Loomis' intent.

### g. *Andrew Halupke's statement*

At trial, the prosecutor called Halupke to question him about his involvement in the bust out scheme and in the planning of Loomis' murder. Halupke testified that he had no present recollection of those matters. The prosecutor attempted to refresh Halupke's recollection by showing him a written statement he made to the police on January 22, 1981, but Halupke testified that he still could not remember. The prosecutor then introduced into evidence, and the trial court admitted, the written statement as a past recollection recorded.

Four elements are required for a hearsay statement to be admitted as a past recollection recorded: (1) the witness must have had firsthand knowledge of the event; (2) the written statement must be an original memorandum made at or near the time of the event and while the witness had a clear and accurate memory of it; (3) the witness must lack a present recollection of the event; and (4) the witness must vouch for the accuracy of the written memorandum. *See, e.g., Commonwealth v. Cargo*, 498 Pa. 5, 444 A.2d 639 (1982). All four elements were met in this case: (1) Halupke took part in the events he described; (2) the statement, though made approximately two years after the events, describes events that are likely to be remembered (such as looking for a place to bury Loomis' body), and indicates that Halupke had a clear memory of the events at the time; (3) Halupke had no present recollection of the events, even after seeing the statement; and (4) Halupke identified his signature on the statement, recalled making and signing it, and testified that he told the police the truth. Thus, the statement was admissible as a past recollection recorded.

### 5. HYPNOTICALLY REFRESHED TESTIMONY

■ Appellant argues that the trial court erred in admitting the testimony of Theresa Slick, who had undergone hypnosis on November 29, 1979. Pursuant to *Commonwealth v. Smoyer*, 505 Pa. 83, 476 A.2d 1304, 1308 (1984), where a party seeks to introduce the testimony of a witness who has previously been hypnotized, the following guidelines must be followed: (1) the party must advise the court of the existence of the hypnosis; (2) the party must show that the testimony to be presented was established and existed prior to the hypnosis; (3) the party must show that the hypnotist was trained in the process and was neutral; and (4) the court must instruct the jury that the witness had been hypnotized and that they should receive the testimony with caution.

■ Here, instead of following the *Smoyer* guidelines, the trial court admitted Theresa Slick's testimony without requiring the Commonwealth to prove that it was independent of hypnosis or that the hypnotist was neutral, and the court did not issue a cautionary instruction. This was clearly erroneous. However, because Theresa Slick's testimony was cumulative of the testimony of Hull, Agent Glasgow, Trooper Golden, and others, we are convinced beyond a reasonable doubt that the error was harmless. *See Commonwealth v. Story*, 476 Pa. 391, 383 A.2d 155 (1978). Accordingly, we decline to reverse Appellant's conviction on this basis.

### 6. HAROLD LITTS' IDENTIFICATION TESTIMONY

■ At trial, Harold Litts identified Appellant as one of the men he saw on Route 502 on the night of the murder. Appellant argues that this testimony should have been excluded because it was the product of an unduly suggestive photo array. This argument is without merit. Litts was shown an array of five photographs, two of which were of Appellant. One of the photographs of Appellant was a mug shot with a piece of tape over the police identification numbers. These circumstances in no way indicate that the photo identification procedure was unduly suggestive. *See, e.g., Commonwealth v.*

*Moore,* 534 Pa. 527, 633 A.2d 1119 (1993) (photo array containing mug shot and one other photograph of defendant was not unduly suggestive); *Commonwealth v. Patterson,* 392 Pa.Super. 331, 572 A.2d 1258 (1990), *alloc. denied,* 527 Pa. 631, 592 A.2d 1299 (1991) (identification made after witness viewed seven or eight photographs in mug book was not unduly suggestive). Accordingly, no relief is due.

### 7. CROSS-EXAMINATION OF TROOPER GENOVA

Appellant argues that the trial court erroneously precluded him from cross-examining Trooper Genova regarding Genova's alleged bias against him and Genova's alleged demotion for tampering with evidence in another capital case. Appellant's allegations are entirely lacking in factual support, and therefore warrant no further discussion.

### 8. PRECLUSION OF DEFENSE WITNESSES

Appellant argues that the trial court erred in precluding a number of defense witnesses from testifying. We discuss each witness as follows:

#### a. *Luke Asande*

Luke Asande, a New York City Sanitation Supervisor, would have testified that a jeep similar to the one driven by Slick was found abandoned in Harlem shortly after the murder. This evidence would have had no probative value, and therefore was properly excluded.

#### b. *Paul Walker, Esquire*

Paul Walker, Esquire, who represented Appellant at his preliminary hearing, would have testified that Hull made a drawing of the murder scene that conflicted with his trial testimony. However, Appellant did not seek to introduce the drawing. Accordingly, the trial court properly excluded Walker's testimony pursuant to the best evidence rule. *See* MCCORMICK ON EVIDENCE, §§ 229–33 (4th ed.1992).

### c. *Frank Muraca, Esquire*

 Frank Muraca, Esquire, who had represented Appellant in previous criminal cases, would have testified that Hull had a reputation for untruthfulness. This testimony was properly excluded because there was no offer of proof that Muraca knew Hull's reputation in the community.

### d. *Patrick Tigue*

 The Commonwealth called Patrick Tigue, who claimed to be an alibi witness for Appellant, during its case in chief, and Appellant questioned him extensively at that time. Hence, there was no need to allow Appellant to call him during Appellant's case.

### e. *Thomas Padden*

 Thomas Padden allegedly would have testified that it was "common knowledge" in the Lackawanna County Jail that the way to get a "deal" was to implicate Appellant. This testimony was properly excluded as lacking probative value.

### f. *Trooper Golden*

 Appellant alleges that Trooper Golden would have corroborated the defense theory that Loomis was killed as a result of his involvement in drug activity. In the Commonwealth's case in chief, however, Trooper Golden testified that Loomis was not involved in any drug activity, and Appellant had an opportunity to cross-examine him on this point. Accordingly, there was no error in precluding Appellant from calling Trooper Golden.

### g. *Warden Thomas Gilhooley*

 Thomas Gilhooley, Warden of the Lackawanna County Jail, would have testified to Appellant's reputation for nonviolence in the jail. This testimony was not relevant to Appellant's reputation in the community at the time of the murder, and was therefore properly excluded.

### h. *Appellant's Mother Marion Young*

Appellant's mother allegedly would have testified to police harassment of Appellant. This testimony was properly excluded as irrelevant.

### i. *Sergeant Lisa Christie*

Sgt. Christie, a police handwriting expert, would have testified regarding a letter written by a man named Garcia that exculpated Appellant. The letter was hearsay, and, therefore, Sgt. Christie's testimony was properly excluded.

### j. *Charles Curtin, M.D.*

Dr. Curtin, who performed the original autopsy on Loomis, would have testified about Loomis' stomach contents. This testimony would have been cumulative, because Dr. Curtin testified about the stomach contents on direct examination during the Commonwealth's case in chief.

### k. *JoAnne Litts*

JoAnne Litts, Harold Litts' wife, allegedly would have given testimony refuting her husband's identification of Appellant and Slick. Mrs. Litts, however, was not present on the night Harold Litts saw the two men on Route 502, nor at his subsequent photo identification. Accordingly, her testimony was irrelevant.

### l. *State Police Trooper James*

Trooper James would have testified that people living in the area of the murder did not hear anything unusual on the night of the murder. This testimony would have been irrelevant hearsay, and was therefore properly excluded.

### m. *Wilkes–Barre Police Officer Andrew Jurriziani*

Officer Jurriziani would have testified that another officer did not follow proper police procedure in handling Loomis' car when it was discovered in the parking lot of the

Wyoming Valley Mall. This testimony was properly excluded as irrelevant.

### n. *Wilkes–Barre Police Chief Donald Armstrong*

Chief Armstrong would have testified that he informed the State Police that Theresa Slick's ex-husband had been making threats against Loomis. This testimony was properly excluded as inadmissible hearsay.

### 9. DEFENSE WITNESSES TESTIFYING IN SHACKLES

Appellant argues that the trial court erred in allowing defense witnesses to testify in handcuffs and leg irons without any showing that such restraints were necessary. These witnesses, however, had a history of assaultive behavior, and the trial court properly determined that shackling was appropriate. Accordingly, no relief is due. *See, e.g., Commonwealth v. Jasper,* 531 Pa. 1, 610 A.2d 949, 955 (1992) ("Proper security measures are within the discretion of the trial court.")

### 10. COMMONWEALTH'S CALLING POTENTIAL DEFENSE WITNESSES

Appellant argues that the trial court erred in allowing the Commonwealth to call potential defense witnesses John Hope and Patrick Tigue during the Commonwealth's case in chief and to question them as on cross-examination, e.g., by asking leading questions. Appellant contends that Hope and Tigue had no relevance to the Commonwealth's case in chief, and that the Commonwealth called them solely to undermine Appellant's alibi defense before he had an opportunity to present it. This is inaccurate.

The Commonwealth called Hope and Tigue to prove that Appellant had spent time in jail with them and had persuaded them to fabricate an alibi for him. Evidence that a defendant has suborned false alibi testimony is admissible as substantive evidence of consciousness of guilt. *See, e.g., Commonwealth v. Carbone,* 524 Pa. 551, 574 A.2d 584, 589 (1990) ("The fabrication of false and contradictory statements by an accused are evidence from which a jury may infer that they

were made with an intent 'to mislead the police or other authorities, or to establish an alibi or innocence, and hence are indicatory of guilt.") Thus, there was no error in allowing the Commonwealth to call Hope and Tigue and question them as on cross-examination.

### 11. Testimony of State Police Trooper Francis Zanin

Trooper Zanin testified that Appellant had attempted to alter his fingerprints by scarring his fingers, and that the only other case in which he had seen something similar was a murder case. Appellant argues that Trooper Zanin's testimony amounted to an expert opinion that only murderers attempt to alter their fingerprints. This argument is ridiculous and warrants no further comment.

### 12. Alleged Prosecutorial Misconduct

Appellant alleges that the prosecutor committed numerous acts of misconduct throughout the trial, as follows:

#### a. Cross-examination of Appellant

Appellant argues that the prosecutor improperly cross-examined him regarding statements made by former Police Chief John Barry that implicated Appellant in a conspiracy to obstruct investigations into his bust out scheme. This line of questioning went to Appellant's motive for killing Loomis, and was a fair response to Appellant's statements on direct examination challenging the Commonwealth to prove that he was involved in illegal activity. Accordingly, the prosecutor committed no misconduct in cross-examining Appellant.

#### b. Cross-examination of Father William Piccard

Father Piccard, a Catholic priest who. worked with inmates at the Lackawanna County jail, testified on direct examination that Appellant had a reputation for nonviolence. On cross-examination, the prosecutor asked Father Piccard about his bias against the death penalty, and, in particular, his testimony in support of a defendant in another capital murder

case. Because a witness' bias or prejudice is relevant and admissible, there was no impropriety in the prosecutor's cross-examination of Father Piccard. *See, e.g., Commonwealth v. Birch,* 532 Pa. 563, 616 A.2d 977 (1992).

### c. *Reference to "The Richard Young Mafia"*

The reference to the "Richard Young Mafia" was made by Trooper Golden, not by the prosecutor. *See* Guilt Phase Issue 4(e), *supra.* Accordingly, it could not possibly constitute an act of prosecutorial misconduct.

### d. *Prosecutor's closing argument*

 Although Appellant argues that the prosecutor improperly offered his personal opinion as to the credibility of the Commonwealth's witnesses, he does not present any examples of such conduct. Accordingly, no relief is due.

### e. *Representation of Hull's plea bargain*

Hull testified that, in exchange for his testimony against Appellant, the Commonwealth agreed to allow him to plead guilty to conspiracy to commit murder and face no other charges. Because Hull has not yet entered his guilty plea, Appellant accuses the prosecutor of perpetrating a "sham." This argument is completely unfounded and warrants no further discussion.

### 13. TRIAL COURT'S JURY INSTRUCTIONS

Appellant argues that the trial court's jury instructions during the guilt phase of the trial were erroneous in a number of respects, as follows:

### a. *Failure to give cautionary instruction on other crimes evidence*

Relying on *Commonwealth v. Billa,* 521 Pa. 168, 555 A.2d 835 (1989), Appellant contends that the trial court erred in failing to give a limiting instruction regarding the evidence of Appellant's other crimes admitted at trial. This argument is unpersuasive.

64

In *Billa*, this Court held that a cautionary instruction was necessary because "the evidence of prior criminal activity was so similar to that for which [the defendant] was being tried that we could not conclude 'with any reasonable certainty that the jury would have returned the same verdict of murder of the first degree had it been properly instructed.'" *Commonwealth v. Sam*, 535 Pa. 350, 635 A.2d 603, 608 (1993) (quoting *Billa*, 555 A.2d at 842–43). Here, however, the prior crimes evidence concerning Appellant's bust out scheme was not so similar to the evidence pertaining to Loomis' murder that the jury's verdict could be considered unreliable. Thus, as in *Sam*, "we are certain that the jury would have returned the same verdict," regardless of the presence or absence of a limiting instruction as to prior crimes evidence. *Sam*, 635 A.2d at 608.

### b. *Failure to give Kloiber instruction*

Appellant argues that the trial court should have given a *Kloiber* instruction with respect to Harold Litts' identification testimony. Pursuant to *Commonwealth v. Kloiber*, 378 Pa. 412, 106 A.2d 820 (1954), where a witness was not in a position to observe the assailant clearly, or has previously failed to identify the defendant, the court must instruct the jury to receive the witness' identification testimony with caution. Harold Litts, however, had an unobstructed view of Appellant, and was able to identify him from a photo array and again at trial. Accordingly, there was no need for a *Kloiber* instruction.

### c. *Instructing the jury that the date of the murder was not relevant*

In general, the Commonwealth need not prove that the crime occurred on the date alleged in the indictment, except where the date is an essential issue in the case, e.g., where the defendant presents an alibi defense. *See, e.g., Commonwealth v. Boyer*, 216 Pa.Super. 286, 264 A.2d 173 (Pa.Super.1970). Here, Appellant did assert an alibi defense, but the Commonwealth completely eviscerated the testimony

of Appellant's two alibi witnesses, John Hope and Patrick Tigue. Hope recanted his alibi testimony, and the Commonwealth proved that Tigue was in jail at the time he claimed to be with Appellant. Accordingly, the trial court did not err in instructing the jury that they could find Appellant guilty even if they found that the murder took place on a date other than that alleged in the indictment.

### d. *Failure to give cautionary instruction regarding accomplice testimony*

Where an accomplice implicates a defendant, the court should instruct the jury that the accomplice is a "corrupt and polluted source" whose testimony must be received with caution. *See, e.g., Commonwealth v. Chmiel,* 536 Pa. 244, 639 A.2d 9 (1994). Here, the trial court gave a "corrupt and polluted source" instruction with respect to Hull's testimony, but neglected to do so with respect to Slick's and Cornell's statements to police, which were admitted into evidence. *See* Guilt Phase Issue 4(d), *supra.* Although this was an error, in light of the corroboration of the statements by numerous other witnesses, we cannot conclude that Appellant was harmed by the oversight of the trial court. Accordingly, because the error is harmless, no relief is due.

### e. *Allegedly erroneous instruction regarding the elements of first degree murder*

Appellant alleges that the trial court failed to instruct the jury that, to convict Appellant of first degree murder, they must find beyond a reasonable doubt that Appellant had a specific intent to kill. This allegation is unsupported by the record, and therefore requires no further discussion.

### f. *Instructing the jury that the credibility of the police was not at issue*

The trial court instructed the jury that the police officers who testified against Appellant, whose credibility Appellant attacked, were "not on trial" and "have not been charged with any criminal offense." Although Appellant char-

acterizes these instructions as the equivalent of telling the jury that "the credibility of the police officers was not an issue in this case," we find no merit in this argument, and, therefore, grant no relief.

### 14. TRIAL JUDGE'S FAILURE TO RECUSE HIMSELF

Appellant alleges that the trial judge exhibited bias and hostility against Appellant in his remarks and evidentiary rulings, and therefore should have recused himself. This argument is patently meritless and requires no further comment.

### 15. PUBLICITY BEFORE AND DURING TRIAL

Appellant argues that extensive publicity about his case both before and during trial prejudiced his rights to a fair trial and an impartial jury. In *Commonwealth v. Casper*, 481 Pa. 143, 392 A.2d 287 (1978), we held that:

> Normally, one who claims that he has been denied a fair trial because of prejudicial pre-trial publicity must show actual prejudice in the empaneling of the jury. But this rule is subject to an important exception. In certain cases there "can be pretrial publicity so sustained, so pervasive, so inflammatory, and so inculpatory as to demand a change of venue without putting the defendant to any burden of establishing a nexus between the publicity and actual jury prejudice."

*Casper*, 392 A.2d at 291 (citations omitted). Pursuant to *Casper*, "a presumption of prejudice . . . requires the presence of exceptional circumstances," e.g., whether the publicity consisted of sensational, inflammatory, and slanted articles demanding conviction; whether it revealed the existence of the defendant's prior criminal record; whether it referred to the defendant's confessions or admissions of the crime; and whether it is the product of police or prosecutorial reports. *Id.*, 392 A.2d at 292 (citations omitted). "Should any of the above elements be found, the next step of the inquiry is to determine whether such publicity has been so extensive, so sustained and so pervasive that the community must be

deemed to have been saturated with it." *Id.* "The critical factor in the finding of presumptive prejudice . . . is the recent and pervasive presence of 'inherently prejudicial' publicity, the likely effect of which is to render a fair trial impossible." *Id.,* 392 A.2d at 293 (citations omitted).

■ Here, Appellant does not attempt to prove actual prejudice, but argues that prejudice should be presumed pursuant to *Casper.* We disagree. Although there were numerous newspaper and television reports about the case before and during trial, the publicity cannot be considered "inherently prejudicial." The majority of the news reports were not sensational or inflammatory, none referred to any confessions or admissions, and, despite Appellant's bald assertions, there is no evidence regarding whether the media coverage was based on police or prosecutorial sources. Although a large number of venirepersons indicated that they had heard or read about the case, the trial court took appropriate measures to limit the possibility of juror prejudice, e.g., questioning potential jurors to determine whether they were exposed to media coverage of the case and whether such exposure would influence their ability to remain impartial; and repeatedly instructing jurors to avoid media coverage of the case and to refrain from talking about the case with others. Considering the totality of the circumstances, we cannot conclude that the publicity surrounding this case was so inherently prejudicial as to render a fair trial impossible. Accordingly, we grant no relief.

Having found no reversible errors in the guilt phase of the trial, we turn to Appellant's arguments regarding the penalty phase.

## B. *PENALTY PHASE*

### 1. TRIAL COURT'S JURY INSTRUCTIONS

As with the guilt phase, *see* Guilt Phase Issue 13, *supra,* Appellant argues that the trial court's jury instructions during the penalty phase of the trial were erroneous in a number of respects, as follows:

68

### a. Failure to instruct the jury regarding ineligibility for parole

Relying on *Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), and other federal cases, Appellant argues that the trial court erred in refusing to instruct the jury that Appellant would be statutorily ineligible for parole if sentenced to life in prison. This argument has no merit. *Simmons* applies only where the defendant's future dangerousness is at issue. *See Commonwealth v. Smith*, 544 Pa. 219, 675 A.2d 1221 (1996). Because Appellant's future dangerousness was not at issue here, a life without parole instruction was unnecessary. Therefore, in denying the instruction, the trial court properly followed Pennsylvania precedent, which holds that capital juries should be precluded from considering the defendant's eligibility for parole. *See, e.g., Smith, Commonwealth v. Christy*, 540 Pa. 192, 656 A.2d 877 (1995); *Commonwealth v. Henry*, 524 Pa. 135, 569 A.2d 929 (1990).

### b. Allegedly erroneous instructions regarding aggravating circumstance (d)(5)

In the penalty phase, the Commonwealth sought to prove one aggravating circumstance: that Loomis was "a prosecution witness to a ... felony committed by the defendant and was killed for the purpose of preventing his testimony against the defendant in [a] grand jury or criminal proceeding involving such offense[ ]." 42 Pa.C.S. § 9711(d)(5). Appellant argues that the trial court erred in failing to instruct the jury with respect to the name or definition of the predicate felony in this case. This argument is meritless. During the penalty phase, the trial court, on request of the prosecutor, took judicial notice of the fact that violations of the Racketeering Influenced Corrupt Organizations Act (RICO), 18 U.S.C. § 1961—the crimes that the federal Grand Jury was investigating and about which Loomis was planning to testify—were classified as felonies. There was no need to instruct the jury with respect to this element of aggravating circumstance (d)(5). *Cf. Commonwealth v. Zettlemoyer*, 500

Pa. 16, 454 A.2d 937 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983) (predicate felony for purposes of aggravating circumstance (d)(5) was never specifically named or defined).

### c. *Allegedly erroneous instructions regarding aggravating and mitigating circumstances*

■ In describing aggravating and mitigating circumstances, the trial court instructed the jury that:

Aggravating circumstances are things about the killing and the killer, Richard Young, which makes a first degree murder case more terrible and deserving of the death penalty, while mitigating circumstances are those things which make the case less terrible and less deserving of death.

Although Appellant claims that this instruction was erroneous, we approved a substantially identical instruction in *Commonwealth v. Saranchak*, 544 Pa. 158, 675 A.2d 268 (1996) ("The Sentencing Code of Pennsylvania defines aggravating and mitigating circumstances. They are things that make a first degree murder case more or less terrible."). Accordingly, Appellant's claim is meritless.

### 2. ADMISSION OF VICTIM IMPACT TESTIMONY

During Appellant's sentencing hearing, which was held on September 6, 1995, the Commonwealth introduced the testimony of Loomis' mother Betty Jane Loomis, who testified regarding, *inter alia*, the impact of Loomis' death on various members of her family:

Prosecutor: Would you tell us what the impact was of the death of your son on your family?

Mrs. Loomis: Well at the time that my son was murdered I had just been diagnosed with cancer and given a chance of one in thirty-five thousand of living. So my family not only had to contend with my son's death, they had to contend with taking me for treatments and everything in between. I had the twelve-year-old. It affected him because his brother and him were close.

. . .

Prosecutor: How did it affect (the victim's brother) Mark?

Mrs. Loomis: Mark didn't care about the law because he said the law let them get away with murdering my brother, so he didn't care about the law anymore. He just didn't care about anything. He needed psychiatric help, I think, but he wouldn't go for it. But he rejected everybody because he said they got away with murder and nobody is going to do anything about it.

. . .

Prosecutor: How has the death of Russell affected (the victim's father) Mr. Loomis?

Mrs. Loomis: My husband had open heart surgery. He had four bypasses and a third of his heart cut away. And you don't live, you wait from day to day to see when they are going to get them, when they are going to be punished for what they did. So that's the way we have lived. At one time we thought the state troopers had given up, that they weren't doing anything, that we were never going to get anything accomplished, but all the time apparently they were working. Thank heavens.

N.T., 9/6/95, at 30–34.

 At the time of Appellant's sentencing hearing, 42 Pa.C.S. § 9711(a)(2) provided that:

In the sentencing hearing, evidence may be presented as to any matter that the court deems relevant and admissible on the question of the sentence to be imposed and shall include matters relating to any of the aggravating or mitigating circumstances specified in subsections (d) and (e). Evidence of aggravating circumstances shall be limited to those circumstances specified in subsection (d).

The legislature amended 42 Pa.C.S. § 9711(a)(2) on October 11, 1995, effective sixty days after that, to provide that, "evidence concerning the victim and the impact that the death of the victim has had on the family of the victim is admissible." In *Commonwealth v. Fisher*, 545 Pa. 233, 681 A.2d 130 (1996) and *Commonwealth v. McNeil*, 545 Pa. 42, 679 A.2d 1253

(1996), however, this Court held that, in sentencing hearings held prior to the effective date of the 1995 amendment, victim impact testimony was *per se* inadmissible. Thus, pursuant to *Fisher* and *McNeil,* we are compelled to hold that the trial court here erred in admitting Betty Jane Loomis' victim impact testimony at Appellant's sentencing hearing. Moreover, as in *Fisher* and *McNeil,* "we are unable to determine how the sentencing jury considered the testimony in weighing the aggravating and mitigating circumstances." *McNeil,* 679 A.2d at 1259. Accordingly, we have no choice but to reverse Appellant's death sentence and remand to the trial court for a new sentencing hearing.

## CONCLUSION

For the foregoing reasons, we affirm Appellant's conviction for first degree murder, but reverse his death sentence and remand the case to the trial court with instructions to conduct a new sentencing hearing in which victim impact testimony will not be admitted.

Chief Justice FLAHERTY files a concurring opinion in which Justice ZAPPALA joins.

Justice CAPPY files a concurring opinion.

Justice CASTILLE files a dissenting opinion.

Justice NIGRO concurs in the result.

FLAHERTY, Chief Justice, concurring.

I join the majority's opinion, but write separately to express the view that in addition to the error of admitting victim impact testimony in this case, it was also error to fail to instruct the jury that appellant would be statutorily ineligible for parole if sentenced to life in prison. It is true that we have held in prior cases that this instruction need not be given except where the appellant's future dangerousness is at issue; however, I would reverse those cases and require the instruction in any case in which the Commonwealth seeks the death penalty.

If we require juries to take responsibility for deciding between life imprisonment and death, we have the duty to instruct the juries fully on the options from which they must choose. There can be no harm in instructing juries that in Pennsylvania appellant would be statutorily ineligible for parole if sentenced to life in prison, and that this sentence, nonetheless, may be commuted by the governor. On the other hand, if we do not so instruct, a jury, erroneously believing that a prisoner sentenced to life may be paroled within a period of years, may impose the death penalty for reasons which are not based in law.

Justice ZAPPALA joins this concurring opinion.

CAPPY, Justice, concurring.

I concur in the result reached by the majority in the above-captioned case. I write separately in recognition that I have taken a different position than the majority advocates herein regarding the issue of victim impact testimony in the penalty phase of a capital case. However, I recognize that my position, as reflected in *Commonwealth v. Fisher*, 545 Pa. 233, 681 A.2d 130 (1996) (Cappy, J. concurring); and *Commonwealth v. McNeil*, 545 Pa. 42, 679 A.2d 1253 (1996) (Cappy, J. dissenting), does not reflect the position of the majority of this court. In recognition of the rule of *stare decisis*, I join in the result reached by the majority in this case.

CASTILLE, Justice, dissenting.

I dissent on the basis of my position in *Commonwealth v. Fisher*, 545 Pa. 233, 681 A.2d 130 (1996) (Castille and Newman, JJ., dissenting) and *Commonwealth v. McNeil*, 545 Pa. 42, 679 A.2d 1253 (1996) (Cappy, Castille and Newman, JJ., dissenting).

## *ON REARGUMENT*

### *OPINION*

CAPPY, Justice.

This matter came to us on direct appeal from a sentence of death. On January 22, 1999, this court affirmed the conviction

of Richard Young ("Appellant"), but reversed the death sentence and remanded for a new sentencing hearing.

Subsequently, Appellant filed an Application for Reargument. On March 31, 1999, we granted this application limited to the issue of

[w]hether unredacted statements of non-testifying codefendants were properly admitted into evidence at trial consistent with the Confrontation Clause of the United States Constitution based upon reliability derived from their status as declarations against penal interest, cross-corroboration and corroboration by other evidence admitted at trial.

For the reasons that follow, we reverse Appellant's conviction for first degree murder.

The facts of this matter were fully discussed in our opinion issued on January 22, 1999. *Commonwealth v. Young*, 561 Pa. 34, 748 A.2d 166 (1999) (*"Young I"*). In brief, Appellant, William Slick ("Slick"), George Cornell ("Cornell"), Ronald Hull ("Hull"), Andrew Halupke ("Halupke"), Russell Loomis ("Loomis") and other persons were allegedly involved in a massive conspiracy in the late 1970s which, at Appellant's trial, was referred to as a "break out" or "bust out" scheme. The conspiracy consisted of the co-conspirators fraudulently obtaining merchandise on credit, avoiding making payment for the goods, and then selling this merchandise either through a fence or through a discount store.

In March of 1979, Loomis was interviewed by Federal Bureau of Investigation Agent Daniel Glasgow ("Agent Glasgow"). Loomis gave Agent Glasgow a statement implicating Appellant, Slick, Cornell, and Hull in the fraud scheme. He agreed to testify before a federal grand jury regarding this criminal enterprise.

On April 11, 1979, several days before he was to testify before the grand jury, Loomis told his live-in girlfriend that he was going on an errand with Appellant. Loomis never returned. Loomis' body was found on April 14, 1979, with two gunshot wounds to the head and one to the back. In Decem-

ber of 1980, Appellant precipitously terminated his residency in Pennsylvania and moved to Idaho, where he began living under the assumed name of Todd Devine. He was arrested in Idaho in 1988 and was extradited to Pennsylvania.

Appellant was tried with Slick for the murder of Loomis. Although Cornell had originally been joined as a defendant, charges against him were dismissed prior to trial pursuant to Pa.R.Crim.P. 1100.[1] The Commonwealth presented several witnesses. Its key witness was Hull, who testified against the co-defendants in exchange for being allowed to plead guilty to the charge of conspiracy. Hull testified that he was privy to various conversations in which the planning for Loomis' murder was made. N.T. 8/21/95 at 29–34. He also testified that on the night of April 11, 1979, he, Loomis, Appellant, and Cornell drove out to a secluded area, ostensibly to retrieve a jeep which had gotten mired in mud. N.T. 8/21/95 at 36–38. After the party had hiked into the woods approximately one half mile, Hull testified, Appellant shot Loomis several times. *Id.* at 50. Hull testified that Loomis spun around and started moving toward the group, yelling at them. *Id.* at 50–51. Hull stated that Cornell then grabbed the gun from Appellant and shot Loomis three more times; Loomis then fell into the creek, dead. *Id.* at 52. The group—augmented by the arrival of Slick—attempted to retrieve Loomis' body and place it in the prepared grave, but were unsuccessful. *Id.* at 56. They thus decided to leave Loomis' body in the creek where it was discovered three days later.

A statement given by Halupke, another co-conspirator, to police in January of 1981 was also read into the record at trial. In that January 1981 statement, Halupke told the police that he and Appellant had driven around for several hours on April 8, 1979, a few days before the murder, looking for a suitable spot to dispose of Loomis' body. N.T. 8/14/95 at 165–67.

The Commonwealth also presented statements made by Slick and Cornell, neither of whom testified at trial. It is the

1. This court recently determined that the trial court improperly granted Cornell's Rule 1100 motion. *Commonwealth v. Cornell,* 558 Pa. 238, 736 A.2d 578 (1999)

admission of these statements which is the focus of this opinion. Slick's statement was given to Trooper Nicholas Genova ("Trooper Genova") of the State Police on February 16, 1981. Slick stated that in late March or early April of 1979, he was privy to a conversation in which Appellant and Cornell plotted ways to kill Loomis and dispose of his body. N.T. 8/22/95 at 148–49. In his statement to Trooper Genova, Slick portrayed his role in this conversation as essentially a passive listener, with his only participation being a suggestion that they could dispose of Loomis' body in a particular mine shaft. *Id.* at 149. Sometime in April of 1979, Slick stated, Cornell and Appellant told him that they had been "out digging a hole" and that Appellant mentioned that it was difficult to dig "a hole a long [sic] a creek or a river big enough to put a body in the size of Loomis." *Id.* at 150. Slick also stated that from the afternoon of April 11, 1979 until a couple of days after the murder, Slick was in Monticello with his girlfriend. *Id.* at 146–47. After Loomis was murdered, Slick said, both Cornell and Appellant admitted to him that they were responsible for Loomis' death. *Id.* at 151. At the end of his statement, Slick emphasized to Trooper Genova that "I don't have any—I didn't have any active role in the planning nor did I[sic] any role in the killing of Russell Loomis." *Id.* at 153.

On March 20, 1981, Cornell gave his statement in which he detailed his knowledge of the Loomis murder. In that statement, Cornell told Trooper Genova that he believed that Appellant was responsible for Loomis' murder. *Id.* at 155. Cornell said that Appellant had owned a .357 caliber gun which Cornell had not seen since the murder.[2] *Id.* Cornell also stated that Appellant had told him to lie to the police to provide Appellant with an alibi for the night of the murder. *Id.* He also stated that he helped Appellant abandon the automobile which was used in the Loomis murder in New York City. *Id.* at 155–56. Finally, Cornell stated that he and

---

2. Other evidence introduced by the Commonwealth at trial showed that the bullets found in Loomis' body were .357 caliber.

76

Hull were together the night Loomis was killed, evidently providing an alibi for himself. *Id.* at 155.

The defense presented evidence refuting nearly every key element of the Commonwealth's case. Appellant took the stand in his own defense, and testified at length that he was not involved in a bust out scheme, and had no part in the planning or commission of the Loomis murder. N.T. 8/30/95 at 161 and 166; N.T. 8/31/95 at 16 and 18. Appellant also offered other evidence to support his claim that he was not involved in the Loomis murder, including an alibi provided by an acquaintance of Appellant's named Anthony Rish. N.T. 8/30/95 at 135–38.

The jury found Appellant guilty of first degree murder. Following a penalty hearing, it sentenced Appellant to death.

A direct appeal to this court followed in which we affirmed the conviction of first degree murder but reversed the judgment of sentence and remanded for a new penalty hearing. Appellant subsequently filed an Application for Reargument requesting, *inter alia*, that we revisit our determination that Slick and Cornell's statements were properly admitted against Appellant. We granted reargument, limited to the issue of whether the admission of Slick and Cornell's statements violated Appellant's rights as guaranteed by the Confrontation Clause of the United States Constitution.[3] For the following reasons, we now reverse Appellant's conviction and remand for a new trial.[4]

In *Young I*, we held that Slick and Cornell's statements were properly admitted against Appellant. We reasoned that these statements were against penal interest, and therefore fell within an exception to the hearsay rule.

**3.** Appellant also requests that we grant review of the other issues which he raised in his Petition for Reargument. We did not grant reargument of these issues in our order of March 31, 1999; we see no reason to revisit that determination.

**4.** We had jurisdiction over this matter in *Young I* pursuant to 42 Pa.C.S. § 9711(h)(1) which states that sentences of death are subject to automatic review by this court. We retain this jurisdiction over this matter on reargument.

*Young I,* at 54.[5] We then went on to reason that Appellant's Confrontation Clause claim was without merit because

> the United States Supreme Court in *Dutton v. Evans,* 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970), held that a statement that came within an exception to the hearsay rule would not violate the Confrontation Clause if it had sufficient "indicia of reliability." *See also Commonwealth v. Coccioletti,* 493 Pa. 103, 425 A.2d 387. 493 Pa. 103, 425 A.2d 387 (1981). Here, Slick and Cornell's statements had ample indicia of reliability because they were corroborated by Hull, Halupke, and each other. Accordingly, Appellant's right to confrontation was not violated.

*Young I,* at 54.

In his brief on reargument to this court, Appellant states that the admission of Slick and Cornell's statements violated his rights as guaranteed by the Confrontation Clause. He claims that as these statements were both largely exculpatory of the declarants, then they could not truly be seen as being against the declarants' penal interests. Furthermore, he claims that it was improper for this court to determine that the statements had indicia of reliability via reference to the fact that the substance of Slick and Cornell's statements was consistent with testimony provided by Hull and Halupke.

Subsequent to granting reargument in this matter, the United States Supreme Court handed down a decision in *Lilly v. Virginia,* 527 U.S. 116, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999), which is directly on point with the issue on which we

---

5. In its brief to this court on direct appeal, and again in its brief to this court on reargument, the Commonwealth expends the bulk of its efforts not on arguing that these statements were against penal interest, but rather on the position that these statements fall within the exception to the hearsay rule for statements made by co-conspirators. This exception, however, applies only to those statements which the Commonwealth establishes were "made during the course of the conspiracy...." *Commonwealth v. Mayhue,* 536 Pa. 271, 292, 639 A.2d 421, 431 (Pa.1994). Slick and Cornell's statements to the authorities implicating Appellant in the Loomis murder were not made until two months after Appellant had fled the jurisdiction to live incognito in Idaho. Under these circumstances, we cannot say that these statements were "made during the course of the conspiracy".

granted reargument.[6] As *Lilly* definitively controls the disposition of the matter *sub judice*, we shall discuss it at some length.

In *Lilly*, Benjamin Lilly ("Benjamin"), Benjamin's brother, Mark Lilly ("Mark"), and Gary Barker broke into a home and stole liquor, guns, and other items. The next day, they carjacked and abducted Alex DeFilippis ("DeFilippis"); one of the three co-conspirators subsequently shot and killed DeFilippis. Later that day, all three men were apprehended by the police.

Mark gave statements to police while in custody. In these statements, Mark admitted that he had been involved in the theft of liquor and had "handled a gun" at one point. *Id.* at 1892. He stated that Benjamin instigated the carjacking and that Benjamin had shot DeFilippis; Mark insisted that he had no role in the killing of DeFilippis and throughout the statement to the police minimized his role in the criminal escapade.

Mark was called as a witness for the Commonwealth at Benjamin's trial for the murder of DeFilippis. Mark, however, invoked his Fifth Amendment privilege against self-incrimination and refused to testify. The Commonwealth then introduced, over Benjamin's objection, the statements Mark had made to the police. The jury convicted Benjamin of capital murder and related offenses and recommended a sentence of death, which the court imposed.

On appeal, the Supreme Court of Virginia concluded that Mark's statements fell within the exception to the hearsay rule applicable to declarations against penal interest by an unavailable witness. The Supreme Court of Virginia stated that statements against penal interest had "sufficient guarantees of reliability" so that the Confrontation Clause is not violated when such statements are admitted. *Id.* at 1893 (quoting *Lilly v. Commonwealth*, 255 Va. 558, 499 S.E.2d 522, 535 (Va.1998)).

**6.** Shortly after *Lilly* was handed down, Appellant filed an "Application to Submit Additional Authority in Support of Appellant's Authority on Reargument Pursuant to Pa.R.A.P. Rule 2501," the additional authority being the *Lilly* opinion. By attached order, we grant this application.

On appeal to the United States Supreme Court, all nine members of the Court agreed that the statements at issue in *Lilly* were erroneously admitted. Yet, the Court did not speak with one voice as to the reasoning which should be employed; in fact, the justices filed five separate opinions in the *Lilly* matter. The multiplicity of opinions, however, does not necessarily mandate that no holding may be gleaned from *Lilly*. The United States Supreme Court has directed that when it "decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds...." *Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260, 266 (1977). We have interpreted *Marks* as requiring that a majority of the Court must agree on these "narrowest grounds" before "that concept can be treated as binding precedent." *Pap's A.M. v. City of Erie*, 553 Pa. 348, 719 A.2d 273, 278 (1998), *cert. granted* 526 U.S. 1111, 119 S.Ct. 1753, 143 L.Ed.2d 786 (1999). In performing this *Marks* analysis on *Lilly*, two opinions—namely, Justice Stevens' opinion announcing the judgment of the Court and Chief Justice Rehnquist's concurring opinion—are critical for our inquiry.

Justice Stevens, whose legal analysis was joined by Justices Souter, Ginsburg, and Breyer, stated that the Court has repeatedly recognized that out-of-court statements made by a nontestifying accomplice may be entered into evidence against an accused without violating the accused's Confrontation Clause rights if the statements are made in circumstances which indicate that they are reliable. He noted that the Court in *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980) provided that "the veracity of hearsay statements is sufficiently dependable to allow the untested admission of such statements against an accused when (1) 'the evidence falls within a firmly rooted hearsay exception' or (2) it contains 'particularized guarantees of trustworthiness' such that adversarial testing would be expected to add little, if anything, to

the statements' reliability." *Id.* at 1894 (quoting *Ohio v. Roberts,* 448 U.S. at 66, 100 S.Ct. 2531).

Justice Stevens turned first to examining whether declarations against penal interest fall within a firmly rooted exception to the hearsay rule. In determining whether an exception is a "firmly rooted" one, a finding that the exception in question has a venerably long history is but the first step in the inquiry. *Lilly,* 119 S.Ct. at 1895. The next phase of the analysis, Justice Stevens noted, is to determine whether the experience derived from applying this exception over the years has established that these types of statements have "special guarantees of credibility [that are] essentially equivalent to, or greater than, those produced by the Constitution's preference for cross-examined trial testimony." *Lilly,* 119 S.Ct. at 1895 (citation omitted). He noted that where a nontestifying witness makes a statement implicating his accomplices, the Court has historically viewed such statements as "presumptively unreliable" as an accomplice has a strong motivation to lie. *Id.* at 1897–98 (citing *Lee v. Illinois,* 476 U.S. 530, 541, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986)). Justice Stevens concluded that "an accomplice's statements that shift or spread the blame to a criminal defendant [falls] outside the realm of those hearsay exceptions that are so trustworthy that adversarial testing can be expected to add little to the statements' reliability." *Id.* at 1898 (internal punctuation and citations omitted). Thus, Justice Stevens reasoned, Mark's statements did not satisfy the first prong of the *Roberts* test.

After concluding that Mark's statements were not admissible under a firmly rooted exception to the hearsay rule, Justice Stevens turned next to examining whether the statements exhibited "particularized guarantees of trustworthiness". One of the arguments the Commonwealth of Virginia presented in relation to this issue was that Mark's statements were particularly trustworthy as they were corroborated by other evidence offered at trial. *Id.* at 1899. Justice Stevens found this argument to be without merit, stating that the fact "[t]hat other evidence at trial corroborated portions of Mark's statements is irrelevant. We have squarely rejected the

notion that evidence corroborating the truth of a hearsay statement may properly support a finding that the statement bears particularized guarantees of trustworthiness." *Id.* at 1900 (internal quotation marks and citations omitted). Justice Stevens concluded that Mark's statements likewise did not meet the second prong of the *Roberts* test and therefore were erroneously admitted. He thus reversed the finding of the Supreme Court of Virginia that Mark's statements were properly admitted, and remanded for a determination of whether this error was harmless.

Chief Justice Rehnquist authored an opinion in which he concurred in the judgment only; he was joined by Justices O'Connor and Kennedy.[7] The Chief Justice rejected Justice Stevens' "complete ban on the government's use of accomplice confessions that inculpate a codefendant." *Lilly*, 119 S.Ct. at 1903. He found such reasoning to be particularly ill-advised as the facts presented in the matter called for a much narrower ruling. The Chief Justice would have found that Mark's statements did not satisfy the first prong of *Roberts*, not on the basis that Mark had inculpated co-conspirators, but rather because the statements disproportionately implicated his co-conspirators while exculpating Mark.[8] The Chief Justice reasoned that those statements "were simply not 'declarations against penal interest'" as Mark's statements were largely exculpatory. *Id.* Thus, he concluded, the statements did not meet the first prong of the *Roberts* test.[9], [10]

**7.** As shall be discussed more fully at footnote 10, *infra*, Justice Thomas indicated in his own concurring opinion that he agreed with the substance of the Chief Justice's concurring opinion.

**8.** The Chief Justice emphasized that *Lilly* did "not raise the question of whether the Confrontation Clause permits the admission of a genuinely self-inculpatory statement that also inculpates a codefendant. . . ." *Lilly*, 119 S.Ct. at 1904 (Rehnquist, C.J., concurring).

**9.** The Chief Justice also noted that the Supreme Court of Virginia had not had the opportunity to analyze the second prong of the *Roberts* analysis. He believed that it was improper for Justice Stevens to analyze this second prong of *Roberts* prior to the Supreme Court of Virginia having an opportunity to address it.

**10.** As noted *supra*, three other opinions were filed by members of the *Lilly* Court. Justice Breyer wrote to recount the history of courts linking

We now turn to analyzing the opinions authored by Justice Stevens and Chief Justice Rehnquist [11] pursuant to the *Marks* standard to see if they agree on any "narrowest grounds". We conclude that they do. We find that a majority of the Court would agree that statements made to the authorities by a nontestifying accomplice which inculpate the defendant more than the accomplice are not admissible pursuant to a firmly rooted exception to the hearsay doctrine and thus do not satisfy the first prong of the *Roberts* test. Furthermore, although Chief Justice Rehnquist specifically stated in his concurring opinion in *Lilly* that he would not reach the second prong of the *Roberts* test as he did not believe that the issue was properly before the Court, Justice Stevens was indisputably correct when he stated that in examining this second prong, a court may not resolve the issue of a statement's reliability by reference to other, corroborative evidence introduced at trial. This issue had been conclusively settled well prior to *Lilly* when a clear majority of the Court stated that "[t]o be admissible under the Confrontation Clause, hearsay evidence used to convict a defendant must possess indicia of reliability by virtue of its inherent trustworthiness, not by reference to other evidence at trial." *Idaho v. Wright*, 497 U.S. 805, 822, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990).

the hearsay rule with Confrontation Clause analysis and potential problems which spring from this linkage. He specifically states, however, that *Lilly* did not provide the vehicle to explore the connection between the hearsay rule and the Confrontation Clause. *Lilly*, 119 S.Ct. at 1903 (Bryer, J, concurring).

Justice Scalia filed a brief concurring opinion in which he stated that as the Confrontation Clause violation was clear, the case needed to be remanded only for a determination of the harmless error issue.

Finally, Justice Thomas also filed a concurring opinion in which he stated that he agreed with the Chief Justice's position, but also wanted to state that he continued "to adhere to my view that the Confrontation Clause extends to any witness who actually testifies at trial and is implicated by extrajudicial statements only insofar as they are contained in formalized testimonial material, such as affidavits, depositions, prior testimony, or confessions." *Id.* at 1903 (Thomas, J., concurring) (citation and internal quotation marks omitted).

11. These two opinions were joined by a total of seven members of the Court.

It now falls to this court to apply the holding of *Lilly* and related United States Supreme Court cases to the matter *sub judice*. We first must examine these statements to determine if they satisfy the first prong of the *Roberts* test. In his statement, Slick gave a detailed account about how he witnessed Appellant's planning of the Loomis murder and how after Loomis' death, Appellant admitted to Slick that he was responsible for Loomis' death. As to his own involvement, however, Slick stressed that "I don't have any—I didn't have any active role in the planning nor did I[sic] any role in the killing of Russell Loomis." N.T. 8/22/95 at 153. Cornell in his statement to the police indicated that Appellant had told him to lie to the police to provide Appellant with an alibi for the night of the murder; he also stated that he believed that Appellant killed Loomis. He stated that his own involvement in this crime was minimal, and was limited to helping Appellant abandon the automobile which was used in the Loomis murder in New York City. Cornell also provided himself with an alibi for the night of the murder.

Both of these statements were highly similar to the ones given by Mark in the *Lilly* matter as they largely exculpated the declarant and inculpated the defendant. We find that pursuant to *Lilly,* these statements were not admissible pursuant to the first prong of the *Roberts* test.

Next, we must examine whether these statements satisfy the second prong of *Roberts* by containing "particularized guarantees of trustworthiness". In *Young I,* we stated that "Slick and Cornell's statements had ample indicia of reliability because they were corroborated by Hull, Halupke, and each other." *Young I,* at 54. Upon revisiting this analysis, we realize that we were in error. The United States Supreme Court has held that the reliability of such statements cannot be inferred from the fact that the substance of the statements is corroborated by other properly admitted evidence at trial. *Wright,* 497 U.S. at 822, 110 S.Ct. 3139. Rather, the proper method for conducting such an inquiry is to focus on the circumstances surrounding the giving of the statement. *Id.* at 820, 110 S.Ct. 3139.

The Court has declared that hearsay statements of accomplices which implicate a defendant are "presumptively unreliable". *Lee*, 476 U.S. at 541, 106 S.Ct. 2056. This presumption may be rebutted by showing that the circumstances in which these particular statements were given make them reliable. *Id.* at 543, 106 S.Ct. 2056. Yet, the Commonwealth has made no effort to rebut the presumption in this matter.[12]

Nor can we independently discern such circumstances. In fact, we find that the United States Supreme Court has found that the presumption is not rebutted where statements are made in circumstances akin to how Slick and Cornell made their statements. In *Lee*, the Court was confronted with a matter where two co-conspirators had given statements to the police about their involvement in two murders; each co-conspirator implicated the other in the commission of the murders. The Court stated these circumstances did not rebut the presumption of unreliability. *Id.* at 544, 106 S.Ct. 2056. The Court reasoned that once police investigation starts, the "jig is up" and former co-conspirators "lose any identity of interest and immediately become antagonists, rather than accomplices." *Lee*, 476 U.S. at 544–45, 106 S.Ct. 2056.[13] In early 1981, when Slick and Cornell gave the statements which are the focus of this opinion, the murder investigation had been on-going for approximately two years; Slick and Cornell were repeatedly contacted by the authorities for questioning concerning their knowledge of the Loomis murder. *See, e.g.,* N.T. 8/22/95 at 121–26; and at 137–38. Furthermore, by the time Slick and Cornell made their early 1981 statements, Appellant had been missing from the jurisdiction for approxi-

12. While we note that *Lilly* is of recent vintage, the rule that statements such as Slick and Cornell's are presumptively unreliable is not. This rule of presumptive unreliability, and its attendant counterpart that this presumption may be rebutted, dates at least as far back as *Lee*—a full thirteen years before we granted reargument on this issue.

13. We note that the Court stressed that even though such a statement made to the authorities might be "found to be voluntary for Fifth Amendment purposes, such a finding does not bear on the question of whether the [statement] was also free from any desire, motive, or impulse [the declarant] may have had either to mitigate the appearance of his own culpability ... or to overstate [his accomplice's] involvement...." *Lee,* 476 U.S. at 544, 106 S.Ct. 2056.

mately two months. We find that these circumstances are akin to those found in *Lee,* and that when Slick and Cornell made their statements in early 1981, they had lost any identity of interest with their other co-conspirators and became mutually antagonistic. Thus, as we find that the presumption of unreliability has not been rebutted in these circumstances, we hold that Slick and Cornell's statements do not meet the second prong of the *Roberts* test, and therefore, were improperly admitted against Appellant.

▮ Now that we have determined that Slick and Cornell's statements were erroneously admitted against Appellant, we must next determine whether this error was harmless beyond a reasonable doubt.[14] This is a burden which the Commonwealth must carry. *Commonwealth v. Mayhue,* 536 Pa. 271, 639 A.2d 421, 433 (Pa.1994). It is axiomatic that "[h]armless error exists where: (1) the error did not prejudice the defendant or the prejudice was *de minimis;* (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict." *Commonwealth v. Robinson,* 554 Pa. 293, 721 A.2d 344, 350 (Pa.1999).

▮ It is beyond cavil that this case does not present a situation where the erroneously admitted evidence was not prejudicial to Appellant. Slick and Cornell's statements specifically identified Appellant as Loomis' murderer. It is difficult to imagine any evidence more prejudicial to a defendant than that which identifies the defendant as a perpetrator of a capital crime.

14. The United States Supreme Court has long recognized that where statements by co-conspirators are admitted in violation of the Confrontation Clause, the reviewing court is to determine whether such an error was harmless. *See, e.g., Lee,* 476 U.S. at 547, 106 S.Ct. 2056. A majority of the justices in *Lilly* indicated that they would not deviate from this precedent. *Lilly,* 119 S.Ct. at 1901 (Stevens, J.) and at 1906 (Rehnquist, C.J., concurring).

▮ Next we must examine whether Slick and Cornell's statements were *merely cumulative of other properly admitted evidence.* The Commonwealth argues that it has met this burden as the testimony of Hull and the statement of Halupke provide the same, and in some instances greater, detail of the crime as was provided by Slick and Cornell. The Commonwealth's analysis, however, is incomplete. In *Commonwealth v. Story*, 476 Pa. 391, 383 A.2d 155 (Pa.1978), the seminal case defining the harmless error analysis in this Commonwealth, we provided a thorough discussion of precisely what the Commonwealth must show in order to establish this second type of harmless error. We stated that only part of this proof is showing that there is substantial similarity between the tainted evidence and the untainted evidence; another critical element is to show that the untainted evidence is "indisputable, either because the facts are in some way affirmatively accepted by the defendant or for other reasons...." *Id.* at 165 n. 21.[15] This standard is a logical one. Where the evidence is disputed, it is necessary that the factfinder weigh the opposing sides' evidence, making credibility determinations where necessary. A jury which had been exposed to tainted evidence would have utilized that tainted evidence in performing this weighing process, thus making its ultimate determination suspect. Furthermore, we as an appellate court cannot attempt to rectify this error by disregarding the tainted evidence and reweighing the properly admitted evidence of the Commonwealth against that presented by the defendant. Where such factfinding functions are implicated, appellate courts are incompetent to choose which side's evidence is more persuasive. *See Commonwealth v. Carson*, 559 Pa. 460, 741 A.2d 686, 693 (Pa.1999). Thus, where the evidence is in dispute, it cannot be said beyond a reasonable doubt that the erroneously admitted evidence was harmless.

**15.** We note that this portion of the *Story* opinion was not essential to the resolution of that matter, and therefore constituted *dicta.* Yet, the *Story* court's discussion of this second prong of the harmless error analysis was not forging new territory, but rather was providing a clear enunciation of established law. *See, e.g., Commonwealth v. Knight*, 469 Pa. 57, 364 A.2d 902, 905 (Pa.1976); *Commonwealth v. Parker*, 458 Pa. 381, 327 A.2d 128 (Pa.1974).

■ In the matter *sub judice*, the Commonwealth cannot show that the untainted evidence is undisputed as Hull and Halupke's version of events were refuted on every critical point by the defense. For example, Anthony Rish provided an alibi for Appellant for the night of the Loomis murder. N.T. 8/30/95 at 135–38. Also, Appellant took the stand on his own behalf and testified that he had no part in the planning or commission of Loomis' murder and did not perpetrate any fraud scheme. N.T. 8/30/95 at 161 and 166; N.T. 8/31/95 at 16 and 18. Thus, as the untainted evidence was disputed at trial, we find that the Commonwealth has not established that this second type of harmless error occurred in the matter *sub judice*.

■ Finally, we must analyze whether "the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict." *Robinson*, 721 A.2d at 350. As noted above, the defense offered testimony directly contradicting that Appellant planned and committed the murder of Loomis, or that Appellant was involved in the bust-out scheme. In fact, the only significant aspect of the Commonwealth's case which Appellant did not contradict was that Appellant left Pennsylvania in 1980 and moved to Idaho where he began living under the assumed name of Todd Devine. When we consider this evidence alone, it is clearly insufficient for us to be able to state, beyond a reasonable doubt, that it overwhelmingly establishes that Appellant was guilty of the murder of Loomis.[16]

We therefore find that the error of admitting Slick and Cornell's statements was not harmless and are compelled to reverse Appellant's conviction and remand for a new trial.

16. The dissenting opinion suggests that the evidence presented by Appellant was simply incredible, and thus should not be considered by this court to have in any fashion refuted the Commonwealth's case. Such credibility determinations, however, are for the factfinder to make, and are not within the province of an appellate court. *See Story, supra.*

Justice CASTILLE files a concurring opinion.

. Justice ZAPPALA concurs in the result.

Justice NIGRO and Justice NEWMAN file dissenting opinions.

CASTILLE, Justice, concurring.

I join the majority because the statements in this case are exculpatory in that the speaker is exculpating himself from the crime and shifting the blame to others. It would be a far different story if the statements were *inculpatory* and inculpated others as co-conspirators. Such statements should be admissible and traditionally have been if redacted. *See e.g., Commonwealth v. Chester,* 526 Pa. 578, 587 A.2d 1367 (1991), *Commonwealth v. Johnson,* 474 Pa. 410, 378 A.2d 859 (1977). Sharing the blame, rather than shifting the blame, is indicia of reliability because the speaker inculpates himself and does not *benefit* by naming others. Therefore, I join the Majority Opinion insofar as the decision is limited to statements in which the declarant is shifting the blame because such statements are not against the declarant's own penal interest.

NEWMAN, Justice, dissents.

I respectfully dissent because even if the trial court incorrectly allowed the introduction of these statements, I am convinced beyond a reasonable doubt that the error was harmless.[1] A full review of the record clearly shows that the tainted evidence was merely cumulative of the untainted evidence,[2] and that the erroneously admitted evidence did not contribute to the verdict against Young. *Commonwealth v. Lopez,* 559 Pa. 131, 739 A.2d 485, 503 (Pa.1999); *Common-*

---

**1.** I note that defense counsel for Richard Young (as well as the prosecution) used (and read into the record) the statements of George Cornell (Cornell) on the basis that the statements were admissible as statements of a co-conspirator (*E.g.,* N.T. August 24, 1995, at 37, 38–60, 65–66).

**2.** William Slick (Slick) and Cornell in their statements admitted participating in an illegal conspiracy with Richard Young and acknowledged conversations with him about killing Russell Loomis. (*E.g.,* N.T. August 22, 1995 at 142–43). This information was cumulative of the testimony provided by Hull and Halupke, and others as set forth *infra.*

*wealth v. Romero*, 555 Pa. 4, 722 A.2d 1014, 1019 (Pa.1999). In *Lopez* and *Romero*, we held that the admission of the custodial confession of Barbosa (a co-conspirator with Lopez and Romero in the murder of Mr. Bolasky), which primarily implicated Romero in the killing, was harmless error. *Lopez*, 739 A.2d at 503; *Romero*, 722 A.2d at 1019 (citing *Commonwealth v. Bond*, 539 Pa. 299, 652 A.2d 308 (Pa.1997)). We determined that the error was harmless because the statements of Barbosa were cumulative of other substantially similar and properly admitted evidence indicating the defendants' guilt. *Id.* I find no significant difference between this present matter and that of *Lopez* and *Romero* because here, like in *Lopez* and *Romero*, the primary evidence for the Commonwealth was not the erroneously admitted statements, but was the testimony of a co-conspirator in the murder, which was corroborated by other untainted evidence.

In this case, the prosecution presented Ronald Hull (Hull), a participant with Young in the slaying of Russell Loomis (Loomis), who testified that he and Loomis and others were involved with Young in an illegal conspiracy, which consisted mainly of a "bust out scheme." (N.T. August 21, 1995 at 18–22).[3] Most of this illegal activity occurred in 1978 through 1980 (before and after the murder of Loomis) and centered around buying merchandise, primarily automotive parts, on phony credit to be filtered to a number of store fronts called "liquidation" stores owned by Young, and also to be sold to a "fence" named Lou Masgay. (*Id.*). Hull testified that he was aware, *before the murder of Loomis*, that the FBI was investigating this illegal activity because he was subpoenaed to appear in front of the grand jury sometime before April of 1979. (*Id.* at 25). Moreover, Young was aware that the FBI was investigating these activities because Hull told Young about his subpoena to testify. (*Id.* at 26).

Hull then testified in intimate detail regarding the circumstances of the murder of Loomis. He recounted a conversa-

---

**3.** Hull admitted at trial that in previous statements to the police he lied and gave varying accounts of the crime in order to cover up his involvement in the crime.

tion that occurred a few weeks before Loomis was murdered in which Cornell and Young were discussing that, "we have to do something about Russell (Loomis)." (*Id.* at 26–27). He was also present when Young asked Paul Nenish (Nenish), whether Nenish could obtain a gun that could not be traced. (*Id.* at 29).[4] In addition, Hull testified that before the Loomis murder, he, Young and Halupke drove around in the woods looking for a spot to "blow away" Loomis and that they came upon the spot where the murder was actually committed. (*Id.* at 30).[5] Loomis testified that on April 10, 1979, Slick and Young asked Hull for some tools and Young told Hull that "it was done," meaning that the grave for Loomis was "dug and done." (*Id.* at 32).

On the following day, April 11, 1979, Cornell told Hull, in the presence of Young, that "everything was all arranged and ready," meaning that this was the day to kill Loomis. (*Id.* at 33). At about 6:00 that evening, Young, Cornell, Nenish, Slick, Loomis and Hull were present at the store.[6] Hull saw and heard Loomis call his girlfriend, Theresa Slick. (*Id.* at 35–36).[7] Hull, Loomis, Cornell and Young left the store in Loomis's car, with Cornell driving, for the stated purpose of retrieving a jeep that was stuck in the mud. (*Id.* at 36–38). Nenish was scheduled to close the store and Slick had left about an hour before this group. (*Id.* at 37). Cornell drove to the designated location and parked alongside a stream and the group walked about a half a mile up to where the jeep was

4. Nenish testified that he sold a .357 Magnum to Cornell in January of 1979. (N.T. August 16, 1995 at 65).

5. In a statement that was read to the jury while Halupke was present, Halupke confirmed that he and Young were looking for a place to dispose of the body. (N.T. August 14, 1995 at 133–34). Further, Roberta Young, Young's ex-wife, testified that the location where the body of Loomis was found was an area where Young took her while they were dating, and he was very familiar with all of the woods in that area and the surrounding secluded area. (N.T. August 15, 1995 at 128–29).

6. Nenish confirmed that he was working that evening and was present at the store. (N.T. August 16, 1995 at 63).

7. Ms. Slick corroborated that Loomis called her and that she heard "Ronnie" laughing in the background (she knew him well and recognized his voice.) (N.T. August 15, 1995 at 167).

supposedly stuck in the mud. (*Id.* at 42–43). Loomis was first, and was carrying a "come along," a tool needed to retrieve the jeep. (*Id.* 42–43, 56). Young was behind Loomis, then Cornell and last Hull, who was carrying a chain. (*Id.*) Cornell and Hull were about eight feet behind Loomis when Cornell said to Hull, out of earshot of the others, "that's the spot right there" and indicated to a location to the right of them where a grave had been dug near an old stone foundation. (*Id.* at 44, 45–46).

As the group approached, there was a jeep on the opposite bank of the stream, which Slick had driven to the scene. (*Id.* at 48–49). At that point, Young, Cornell, and Hull were on one side and Loomis started to cross a log that bridged the creek. Just before he got to the end, Young "pulled out a gun" and shot at Loomis two to three times. (*Id.* at 50). Loomis turned around, started taking a few steps towards the group and was stumbling a bit and "yelling and cursing." (*Id.* at 50–51). At that point, Cornell took the gun from Young and shot at Loomis three times. (*Id.* at 52).[8] Hull then stated that he, Young and Slick tried to remove Loomis's body from the stream, but he was "stuck in there." (*Id.* at 56). After the group determined they could not move the body (he was a large man—six foot five and about 250 pounds), Hull walked back to the car of Loomis, a green Ford LTD, and drove to the main road, Route 502. (*Id.* at 59). Then "the muffler or something came apart" and Hull stopped the car. (*Id.* at 59–60).

The jeep pulled up behind Hull and all three in the jeep got out and attempted to put the muffler back on the car. (*Id.* at 60–61). When the problem was repaired, Hull got in the car, "made a U-turn" and headed down the road towards a shopping mall in Wilkes Barre, where Young had told Hull to leave

8. The medical evidence was consistent with Hull's testimony. Both the Commonwealth and defense experts agreed that Loomis was shot first in the back, and then put his hands defensively to his head and a shot went through his hand into his skull. He was then shot through the jaw. It was possible for him to talk, although the bullet perforated the trachea, and although the bullet injured his spine, there was agreement that it could be possible for him to take a few steps.

the car. (*Id.*). As directed, Hull left it at the mall and then called Young's brother-in-law, who came to pick up Hull and brought him to the home of the parents of Young. (*Id.* at 61). Hull, Cornell, Young and Young's parents then discussed how to dispose of the gun. (*Id.* at 63–67). Hull said that after several attempts to destroy the gun, Young disposed of it in the river, which ran behind his house. (*Id.*).

The remainder of the Commonwealth's evidence corroborated the testimony of Hull. The location and position of the body were confirmed by a number of witnesses. Mr. Shorten, who discovered the body of Loomis while fishing on April 14, 1979 testified that the body was wedged between some cement and a log in a trout stream. (N.T., August 8, 1995 at 92–140, N.T. August 22, 1995 at 115). The location was as described by Hull, which was a very secluded wooded area. The investigating officers noted the prominence of a large hole that appeared to be a grave. (N.T., August 9, 1995 at 11–140.) All confirmed the position and location of the body in the stream and indicated that the body was wedged so tightly that it took four officers to remove it from the creek. (August 22, 1995 N.T. at 116). They further testified that the come along was underneath the body. (N.T. August 9, 1995 at 60).[9] Officers in Wilkes Barre confirmed that Loomis' car was discovered in the shopping mall on the evening of April 13, 1979, in the spot described by Hull. (N.T. August 16, 1995 at 12–13). Another witness who worked with Loomis confirmed that he saw Loomis's car parked at the liquidation store at about 6:30 p.m. on Wednesday April 11, 1979, but his car was not there later in the evening nor the following day. (N.T. August 14, 1995 at 73–80).

Contrary to the view expressed in the Majority Opinion, Hull's testimony regarding the involvement of Young with Loomis and others in illegal activity, and thus a motive for the murder, was not credibly refuted. Testimony from numerous

9. Note that Curacello said that he and Loomis were using the come along on Wednesday, April 11, 1979 but it was not there on the following Thursday or Friday, his last two days of work at the store. (N.T., August 14, 1995 at 68, 77).

witnesses indisputably indicated that Young was involved in an illegal conspiracy. In fact, all of the conspirators pled guilty to federal charges related to activity involving Young and that arose from the FBI's investigation. (Joe Brizinski, Hull and Bill Nolan all testified that they pled guilty to charges that arose from these activities.) Indeed, Nolan, the accountant for Young, testified that he had been incarcerated in federal prison for four and half years because of his involvement with Young, specifically that he notarized a document to be used by Young as evidence in his defense during a preliminary hearing concerning these conspiracy charges. (N.T. August 24, 1995 at 178, 184, N.T. August 25, 1995 at 8). Moreover, the jury heard that Young himself pled guilty to charges arising from the FBI investigation with which Loomis had agreed to cooperate. (N.T., August 17, 1995 at 34–35).

Further, Hull's testimony regarding the motive for the murder was supported by several witnesses. Brizinski, a co-conspirator in many of the illegal activities at the liquidation stores,[10] testified that in about February of 1979, Young asked him whether Loomis could be trusted and that Brizinski had told Young that Loomis was a snitch. (N.T. August 15, 1995 at 62–63). Theresa Slick, the live-in girlfriend of Loomis, testified that Loomis told her that Young faked a burglary and confirmed that Loomis was talking to the police about Young. (*Id.* at 160, 162). She indicated that in February of 1979 Loomis was very nervous because of the situation with Young and that he was talking to the police. She testified that Loomis told her that if "Rick found out, something would happen" and that he was afraid of all the "shady things going on." (*Id.* at 163, 195).

10. Brizinski, one of the co-conspirators who was a subject of the FBI's investigation, testified that he worked in a store that was owned by Young and that he was involved with Young in the "bust out" scam, and described what that was. (N.T. August 15, 1995 at 51). He testified about false claims that he participated in with Young where he burned a U-haul to collect insurance for the merchandise inside. (*Id.* at 56). He testified about two additional schemes where Young and he would stage a burglary and than claim insurance for the stolen goods, and he testified that one of these schemes occurred before the murder of Loomis and one afterwards in 1980. (*Id.* at 58).

The Commonwealth also called an Officer Golden, who was a neighbor of Loomis (*Id.* at 23). He testified that two to three weeks before the murder, Loomis called him and said he had to speak to him the night of his call. (*Id.* at 26). After meeting with him, Loomis told Golden that "he was afraid of Richard Young" and that, because of his "association" with Young, he was "afraid for [his] mother and [his] father and anyone else with whom he was connected." (*Id.* at 26–27). He further told Golden that "I (Loomis) am in his Mafia" and that "Richard Young's Mafia is worse than any Mafia I ever heard about." (*Id.*). He further stated that if "we just tried to get away from him, or you know quit, he said that he would kill our mothers, our fathers, our children, or whatever it took." (*Id.* at 28.). Golden, on this information, told Loomis to talk to the FBI, and he referred him to an agent that Golden felt that Loomis could trust. (*Id.* at 29).

Agent Glasgow, an FBI agent in the Scranton area, confirmed that Loomis had spoken to him following his talk with Golden. Agent Glasgow testified that Loomis gave him a statement that indicated that he was involved in an illegal conspiracy with Young, Cornell and others. (N.T. August 17, 1995 at 15—26). He said that he spoke to Loomis in March of 1979. Through Glasgow, the Commonwealth introduced the statements by Loomis, given on March 21, 1979 to the FBI. (*Id.* at 17). Glasgow indicated that a federal grand jury had been empaneled and that he (Glasgow) had intended that Loomis appear, which would be at the next session in April. (*Id.* at 19). In his statement to Glasgow, Loomis indicated that he worked for Young running an operation known as Brown's Sale Company, which was a drop point for stolen goods and that it was to be "torched" to get insurance money. Loomis also outlined the "bust out" scheme that Young and Cornell orchestrated. (*Id.* at 20–24). Loomis specifically named Young and Cornell as direct participants in the scheme and illegal activity. (*Id.* at 25).

Hull's statements concerning the course of events on the night of the murder were confirmed by the testimony of Harold Litts and his brother Gary, who lived near where the

victim was found. Harold Litts testified that on April 11, 1979, his brother called him outside because he heard screams and sounds like firecrackers coming from the woods. (His brother was outside gathering "nightwalkers" in preparation for trout season)(N.T. August 17, 1995 at 90–91). Harold Litts went outside and heard the screams, which were "sharp" and "shrilly." (*Id.*). About a half an hour after going back indoors, Harold's brother called him outside again, indicating that there was "someone parked down the road from the house." (*Id.* at 91). He went outside again and saw a car parked about a hundred yards from his house. "There was movement, silhouettes from the headlights and stuff of cars coming up the road and stuff." (*Id.* at 91). Harold Litts said that a pick up truck with "cab lights on it" pulled up behind the car. The cab lights were "little lights over the windshield." [11] Litts and his brother were concerned that someone might be tampering with their fuel trucks and they drove down to where the vehicle was parked. (*Id.* at 92). When they drove past the car that was parked, a man stepped "about three foot into the road looking at us." (*Id.* at 94). He also saw two men standing behind the car that he could identify because the trunk light on the car worked and because the headlights from his own car illuminated the men. Litts went back to his house and continued to watch the car. Awhile after "the car with the loud muffler went up the road, it went up the road a ways, turned around, and went back down the road." (*Id.* at 95). A few days later, both Gary and Harold Litts identified the car that they saw as the green Ford LTD owned by Loomis, and which the police had found in the shopping mall. (*Id.* at 96, N.T. August 16, 1995 at 169, 173,175). Some years later, Harold Litts also identified Young from a photo array as one of the men standing behind the car. (*Id.* at 101–02).

11. Paul Nenish testified that he sold to Young a green pick-up jeep, with lights on the cab, on March 30, 1979. (N.T. August 16, 1995 at 55–56). Halupke testified that Nenish drove a green jeep, but after Loomis was killed, he never saw it again. (N.T. August 14, 1995 at 168).

Because of the detail of Hull's account and the numerous witnesses who corroborated the intricacies of his testimony, the Commonwealth overwhelmingly showed Young's guilt and the statements of Slick and Cornell played no significant role in that verdict. It seems particularly telling that the smallest parts of Hull's story were confirmed, such as Harold Litt's identification of Young with Loomis's car on April 11, 1979, Litt's description of Loomis's car as the one with the loud muffler, the statements of Loomis that he was afraid of Young, the vast number of people who confirmed that on April 11, 1979, Loomis was planning to pull a jeep out of the mud,[12] and the medical evidence confirming the sequence of the shots.

In conjunction with this clear case, Young's own behavior following the murder, including fleeing the jurisdiction in 1980 when it was clear that the State Police had a warrant for his arrest, enlisting Nolan to fabricate documents, his continual lies about his identity when he was apprehended in Idaho, going so far as to try to obliterate his prints, speak loudly to

---

12. For example, as set forth *supra*, Theresa Slick said that Loomis told her at about 6:30 p.m. that he was going to pull a jeep out of the mud. Also, Beth Ann Fashauser, who in 1979 was the girlfriend of one of Loomis' co-workers, Jerry Curacello, testified that Loomis usually gave Curacello a ride to work, but on Wednesday, April 11, 1979, she had to give Curacello a ride to work because Loomis did not show up. (N.T. August 10, 1995 at 112–115). Later that day, about noon, she brought Curacello his lunch at work and brought it to him in the basement of the automotive store where Curacello and Loomis were working. (*Id.* at 115). She then overheard Loomis tell Curacello that Curacello would not be helping to pull the jeep out of the mud tonight because Young had said that Curacello could not leave. (*Id.* at 115–116). Curacello also confirmed this conversation. (N.T. August 14, 1995 at 69, 70).

A number of other witnesses who were patrons at the bar where Loomis frequented testified that Loomis told them that he was going to retrieve a jeep that was stuck in the mud and if he could get it out, he could have it. (N.T. August 14, 1995 at 38, 46–47). They confirmed that this conversation occurred on Wednesday, April 11, 1979. (*Id.*). Another witness, Mr. Bartosh, who owned the bar, indicated that Loomis used to be in that bar almost every day and that he told Bartosh on April 10, possibly April 11, that he was "going to get a four wheel drive vehicle that he could have if he could get it out of the mud." (N.T. August 15, 1995 at 17).

Further, Nenish testified that on April 11, 1979, Loomis and Young came into the store looking for a chain and a jack to get something "unstuck." (N.T. August 16, 1995 at 63).

his guilt. Moreover, his repeated attempts to fabricate an alibi show a clear consciousness of his guilt that remove any doubt that the jury convicted Young of this murder for reasons completely unrelated to the tainted evidence. *See, e.g., Commonwealth v. Carbone,* 524 Pa. 551, 574 A.2d 584, 589 (Pa.1990) (fabrication of false and contradictory statements by accused are evidence which jury may infer were made with intent to mislead police or other authorities, or establish an alibi or innocence, and hence indicatory of guilt).[13] In addition, the jury heard that soon after the murder, Young overtly tried to get at least one witness to change his story about the last time that he saw Loomis. (N.T. at 78–80). The jury also heard Young admit that he gave false statements in interviews with police in Idaho where he continued to insist that he was Todd Devine and he acknowledged that he fabricated and submitted to the United States Marshals a false social security number and false tax records in the name of Todd Devine. (N.T. August 31, 1995 at 153–60).

Most tellingly to a jury must have been Young's own behavior to concoct an alibi while he acted as pro se counsel. The Majority notes that Young presented an alibi defense, but the record shows that this defense was so seriously undermined that there is no doubt that the jury rejected it for reasons completely unrelated to the statements of Slick and Cornell. First, the jury heard that Appellant had acted as counsel on his own behalf for most of the pre-trial in this matter. At that time, Appellant had listed three witnesses who could supposedly provide Appellant with an alibi for April 11, 1979. The first of these, John Hope (Hope) had provided an affidavit in 1993 while Young was pro se counsel. Hope swore that he was with Loomis on April 13, 1979 and Loomis was driving a green jeep. (Thus, Young could not have killed

---

13. The Commonwealth called Officer Zanin to testify that he took fingerprints of Young in November of 1990 and compared these to fingerprints taken in 1988 when Young was going under the alias of Todd Devine. (N.T. August 23, 1995 at 70). The fingerprints show that each finger had some point of scarring from a searing type of burn, "mechanically induced by the person himself in order to distinguish and try to hide some of the comparison points in the prints themselves." (*Id.* at 74).

Loomis on April 11, 1979 because Loomis was still alive). (N.T. August 23, 1995 at 43). The problem with this "alibi" is that on April 11, 1979 Hope was in jail, so Hope was clearly lying. (*Id.* at 52). Further, at the time that Hope provided the false affidavit he was in a cellblock with Young. (*Id.* at 51). While Hope claimed that he provided the affidavit at the behest of the district attorney's office in order to "get" Young, the claim was utterly fantastic because of Hope's implausible accusations and rambling justifications. (*Id.* at 44–50, 56).[14] The false affidavit acted as a defense for Young, was written while Hope and Young were jail mates and while Young was his own counsel. Thus, the jury was left with the clear impression that Young had fabricated evidence of an alibi, not the Commonwealth. (*Id.*).

Further, and most damning to Young's alibi defense was Patrick Tigue, who was also presented as an alibi witness while Young acted as his own counsel. Like Hope, Tigue was an inmate who had extensive contact with Young in the jail system. Tigue stated that in 1979 he had been at Young's store and had a signed receipt that showed that at 8:57 p.m. on April 11, 1979 Young was at the store, consequently providing Young with an alibi for the night of the Loomis murder. (N.T. August 24, 1995 at 16). Young and Tigue both signed the receipt at issue. (*Id.* at 18–19). However, the problem with this witness was the same as with Hope—he was in jail on April 11, 1979 so it would have been impossible for him to have been in the store with Young at that time. (*Id.*)[15] Worse than that the alibi testimony fell apart was the proof that Young directly participated in this fabrication because Young's signature was on the phony receipt and Young, as his own counsel, had called Tigue as a witness in pre-trial proceedings. Moreover, during Young's testimony at trial, he

14. Moreover, the affidavit's substance—that Loomis was alive on April 11—undermined the focus of the Commonwealth's case that Loomis was killed on April 11, 1979.

15. In addition, the witness indicated that he remembered the date of the April 11, 1979 because of his son's baptism, however, the district attorney presented the son's baptismal certificate, which indicated that the baptism was in March, not April.

created an incredible story that the Tigue who he had listed as an alibi witness when he acted as pro se counsel, was not the person who signed the receipt because there were a lot of people by the name of Tigue in the phone book. (N.T. August 31, 1995 at 122–23, 152). In light of the testimony of Tigue and Young, it was quite clear that Tigue was not a credible witness. Worse for Young, the clear impression was that Young had created this witness in order to fabricate an alibi, certainly evidence of consciousness of guilt.

The Majority finds significant that a third witness, Anthony Rish, "provided an alibi" for Young on April 11, 1979, the date the Commonwealth contended that Loomis was murdered. However, as holds true with Young's other two alibi witnesses, Rish was a fellow prison mate of Young's, and his story lacked any credibility. Rish only came forward with this alibi in 1992 when he first sent a letter to the State Police (and when he and Young were in prison). On the stand, Rish claimed that he remembered the date of April 11, 1979, because he had a birthday party for his daughter the day before that, however, his wife told police that there was no birthday party for their daughter. (N.T. August 30, 1995 at 153–55). Further, his statement given to the police in 1993 indicated that he did not "know the month or year" of this alleged visit with Young but remembered the day only because Young had told him the day was April 11, 1979. (*Id.* at 145–46). Moreover, Rish claimed that he was with Young from 3:30 p.m. until at least 8:00 p.m., almost without interruption, but Young testified that he had a "meeting" with Hull, Slick and Cornell at 4:30 p.m. that day regarding air fresheners. (*Id.* at 140, 144, N.T. August 31, 1995 at 146–48). Further other witnesses, including Nenish who closed the store the night of April 11, 1979, testified that Young was not there when he closed the store at 8:00 p.m. (N.T. August 16, 1995 at 63). Further, because of the track record with the other two "alibi" witnesses, and the numerous other events in which Young was shown to have fabricated evidence, it seems clear to me that in rendering its verdict against Young, the jury accepted the testimony of other

witness that indicated that Young was not at the store on Wednesday evening, the time the murder occurred.

For the reasons stated above, I have no doubt that the erroneous admission of the statements of Slick and Cornell were cumulative of other properly admitted evidence, had no impact on the jury's verdict in this matter and that the error in admitting them was harmless beyond a reasonable doubt. Accordingly, I dissent.

NIGRO, Justice, dissenting.

I join Madame Justice Newman's dissenting opinion to the extent that she would find that the improper introduction of Slick and Cornell's statements constituted harmless error, since the statements were merely cumulative of substantially similar, properly admitted evidence.[1] *See, e.g., Commonwealth v. Lopez,* 559 Pa. 131, 163, 739 A.2d 485, 503 (1999); *Commonwealth v. Romero,* 555 Pa. 4, 14–16, 722 A.2d 1014, 1019 (1999); *Commonwealth v. Washington,* 547 Pa. 550, 557, 692 A.2d 1018, 1021 (1997); *Commonwealth v. Foy,* 531 Pa. 322, 327, 612 A.2d 1349, 1352 (1992).

1. As noted by Madame Justice Newman in her dissenting opinion, Slick and Cornell's statements were merely cumulative of Hull's testimony, which was corroborated by other untainted testimony and physical evidence.