**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| EDWARD M. MITCHELL | |
| Appellant | No. 3176 EDA 2018 |

Appeal from the Judgment of Sentence September 14, 2018
In the Court of Common Pleas of Delaware County
Criminal Division at No: CP-23-CR-0004169-2017

BEFORE:  OLSON, J., STABILE, J., and NICHOLS, J.

MEMORANDUM BY STABILE, J.:          **FILED DECEMBER 24, 2019**

Appellant, Edward M. Mitchell, appeals from his aggregate judgment of sentence of 77-384 months' imprisonment imposed for six convictions of theft by deception, six counts of restricted activities, twelve counts of bribery, six counts of conspiracy to commit theft by unlawful taking, six counts of conspiracy to commit receiving stolen property and six counts of conspiracy to commit theft by deception.[1]  Appellant argues, *inter alia*, that the trial court erred by denying his motions for mistrial based on witnesses' remarks during trial.  We affirm.

The trial court summarized the evidence as follows:

Upland Borough is a community located in Delaware County, Pennsylvania.  The Borough is roughly six-tenths of a square mile

---

[1] 18 Pa.C.S.A. § 3922, 65 Pa.C.S.A. § 1103, and 18 Pa.C.S.A. §§ 4701 and 903, respectively.  The jury found Appellant not guilty of two counts of intercepting communications.

and is home to approximately 3,200 residents. From 2009 through 2015, Appellant was the President of Upland Borough Council. Michael Ciach was the Mayor of Upland Borough. Christine Peterson was the Police Administrative Secretary and also Vice President of Council. Shirley Purcival was the Borough Manager. Moria Crawford was a member of Borough Council. Nelson Ocasio was a patrolman for the Borough and eventually Chief of Police. Thomas Willard was the owner of Logan Solutions. Much like any town, personalities clashed, and perceived alliances ensued. The 1,345 page trial record demonstrated that Upland Borough was not exempt from the small town politics; however, in an effort to streamline the voluminous record, the following testimony relates directly to the charges Appellant faced and the issues raised on appeal.

Ciach is currently employed by Upland Borough as the Borough Manager and has been so employed since May 2017. As Borough Manager, his duties include running the Borough's day-to-day operations, managing accounts payable and accounts receivable, and managing the municipal facilities, such as: McQueen Hall, the borough hall building, which houses the borough offices and Council chambers (sometimes referred to as the meeting hall), the Pavilion located in the park at 7th and Church Street, used for various community events, and the Reese Center, located at 500 West 24th Street, which is currently used as a maintenance garage but is targeted to be used eventually as a recreation facility. In the same parking lot, but not connected to McQueen Hall, is the Borough's Police Department building.

The exteriors of the Borough buildings are protected by sixteen surveillance cameras. The surveillance provided by these cameras focuses on the outside of the building as well as the foyer of Borough Hall; they do not provide footage of anything occurring inside the Borough Hall offices or Council chambers. There is no sound recording on any of the sixteen cameras.

Prior to his current position as Borough Manager, and relevant to the timeframe of this case, Ciach was the Mayor of Upland Borough from 2005 to 2017. During his time as Mayor, Ciach was essentially the administrative head of the Police Department.

On May 3, 2016, while in his capacity as Mayor, Ciach needed to review some of the building's security camera footage, so he called Willard, the owner of Logan Technology, who installed the

system, and asked him to come over to Borough Hall and show him how to access the footage. Ciach also wanted Willard to explain how the system worked so that Ciach did not have to pay Willard to come down to the Hall every time he needed to view footage from the system. Between 2009 and 2015, Willard's company, including its employees, Michael Kinsler and Steven Bradley, performed the vast majority, if not all, of Upland Borough's security work.

Willard came to the Borough Hall building and was showing Ciach how to operate the DVR system attached to the cameras when Ciach noticed a second, smaller DVR set that was completely unbeknownst to Ciach. Ciach asked Willard what that DVR set was attached to, and Willard told him that the small DVR set was attached to the covert camera system. Surprised at the response, Ciach asked Willard to explain the covert cameras; Willard pointed to what appeared to Ciach to be motion sensors on the wall, which were hidden cameras. When Willard pulled up the monitor associated with the covert system, Ciach found himself staring at footage of inside Council chambers as well as right behind the secretary's desk in the Borough Office, both places that cameras were never approved to be monitoring.

Ciach asked Willard who authorized him to put in the covert system, and Willard responded that Appellant told him to install the system. Willard mentioned that the system footage could also be sent to a camera or to a telephone, and that Appellant was using that remote access feature to receive the footage on his phone.

As Ciach further examined the system, he noticed that the wiring seemed to indicate that there was also some type of audio associated with the footage on the covert system. Ciach later learned that he was correct in his suspicion, that there was audio associated with separate microphones placed in the Council room as well as in the secretary's office in Borough Hall. Ciach had no idea that the sensors in the Council room were actually hidden cameras and certainly did not know that they were recording the audio inside the room. After Willard left, Ciach began examining the footage of the covert system, finding about thirty days' worth of footage, while the known DVR only had eight days' worth of footage, which immediately was suspicious to Ciach, because he knew this DVR was capable of holding thirty days' worth of footage.

Ciach contacted his solicitor about the covert cameras that he had discovered and was advised to call Detective Lythgoe of Delaware County CID. Ciach called Detective Lythgoe and described the covert system to which he had just become aware. Detective Lythgoe came down to Borough Hall and met with Ciach, who showed him the covert system. The two examined the files on the system which had both audio and video.

As Borough Manager, Ciach attended every Council meeting; at no time did Council ever discuss, let alone approve, the installation of a covert camera system in the meeting hall. While viewing the footage, Ciach came across a recording from February 22, 2016, that included video and audio footage of a meeting located in Council chambers between himself, Detective Kazlow and Sergeant Patterson about a separate investigation they were conducting into the false arrest of Christine Peterson. At the time of the meeting, neither Ciach nor the detectives involved had any idea that they were being recorded.

After the discovery of the covert system, Ciach and the other members of Council took independent action to investigate. Randy Martin, a surveillance specialist, was hired to come in and sweep the Borough for listening devices and other possible cameras. Martin and his team located microphones at the base of the front of Council's desk; the microphones were placed into two small holes which appeared to be drilled into the desk. Upon locating the microphones, Ciach again called Detective Lythgoe, who removed the microphones.

As a result of the covert system being located and the investigation into Peterson's arrest, CID conducted investigations in Upland Borough on a regular basis. On March 25, 2016, Ciach was asked to provide Detective Lythgoe with 1099 forms for Logan Solutions; Ciach provided Detective Lythgoe with 1099 forms from 2009 through 2015. The 1099 forms reflected the following income for Logan Solutions from Upland Borough:

1099 Form 2015: $ 47,953.70
1099 Form 2014: $ 82,764.95
1099 Form 2013: $ 299,163.00
1099 Form 2012: $ 142,169.50
1099 Form 2011: $ 93,254.49
1099 Form 2010: $ 158,432.00

1099 Form 2009: $ 90,184.00

In relation to the Borough's budget, Logan Solutions was paid a disproportionate amount. In 2013 alone, Logan Solutions received ten percent of the Borough's entire budget. No other vendor who ever dealt with the Borough was ever paid that much. Ciach also provided Detective Lythgoe with the invoices from Logan Solutions from the years of 2009-2015 and copies of checks made out to Logan Solutions from the Borough. Despite all of the money paid to Logan Solutions, Ciach never recalled a proposal or an invoice voted on for Logan Solutions at any Council meeting; nor did Ciach recall Logan Solutions going through the bidding process during the years of 2009 through 2015.

Councilwoman Moria Crawford did not recall Logan Technology ever going through the bidding process, either. In addition, Crawford did not recall seeing any of the proposals for the work contracted to Logan Technology. In addition, Crawford had no idea that there were cameras or microphones in the Council hall or chambers.

Shirley Purcival was employed with the Borough of Upland for thirty-two years. Purcival started out as the police secretary, moved to recording secretary and eventually Borough Manager. Purcival retired in 2015 due to physical stress due to her relationship with Appellant. Specifically, Purcival felt that as Borough President, Appellant was unduly creating so much stress on her that she was not sleeping and developed acute eczema.

During her time with the Borough, Appellant introduced Purcival to Willard; Appellant told Purcival that he personally vouched for Willard. Part of Purcival's duties for Upland Borough required her to be familiar with the bidding process for potential vendors. When Appellant became President in 2008, Council was required to bid out jobs over $10,500. That process included drawing up specifications for the job, placing an ad in a general circulation publication that bids would be accepted on a specific date, time and place. Council would require sealed bids and bid bond, normally ten percent of the bid prices. If a job was going to cost between $4,000 and $10,000, Council was required to get three quotes, by telephone or writing. During the years of 2009-2015, Logan Solutions never participated in either type of bidding process for the work performed in the Borough. As Borough Manager at the time, these bids would have specifically come to

her or the project engineer and Purcival would personally sit in on the unsealing of the bids received. During her time, Logan Solutions performed security services for Upland Borough, including installing burglar alarms, fire alarms, outside security cameras, and access control panels on the doors. The work completed by Logan was always initiated by Appellant.

Most alarming to Purcival was the process in which Logan Solutions was paid. At the direction of Appellant, Purcival was told to pay Logan's invoices as soon as they were received, which was not the common practice for any other vendor doing work. In addition, if an invoice was over a specific amount, such as $10,000, Purcival was instructed by Appellant to pay the invoice off in separate payments, as a solution to Logan bypassing the bidding requirements. That was also not common practice for any other vendor. Specifically, Purcival recalls a time where she took two days off in the end of August. When she returned from those two days, Appellant immediately came into her office and was annoyed that she had not paid one of Logan's invoices before taking her two days off. Purcival told Appellant he must have forgotten that she was off. Appellant was curt, stern, telling her to pay the invoice right away. There were even times that Purcival was instructed to pay invoices of Logan's when the work had not been completed. Purcival attempted to converse with Appellant about her concerns; however, she was always met with animosity, and Appellant made it clear on several occasions that she would be terminated for noncompliance.

During Appellant's reign as President, Nelson Ocasio was Chief of Police in Upland Borough. The police station was located in a separate building from Borough Hall. Prior to his time as Chief, Ocasio was a patrolman with [sic] for the Borough. Ocasio became Chief after Chief John Easton retired. Chief Easton retired earlier than expected, so Ocasio was relatively young to be in the role. Due to his age, Ocasio looked to Appellant and to other members of Council for guidance and mentorship. Despite being close with Appellant, Ocasio had no idea that covert cameras were installed in Council's meeting hall. During his time as Chief, Ocasio had occasion to interact with then administrative assistant, Peterson. In June 2015, Ocasio became aware that a set of dash cameras that had been ordered for the police cars were missing, a project that Logan Solutions had been working on. At the direction of Appellant, Ocasio did not investigate the missing police dash cameras. Appellant told Ocasio that the cameras were

stolen by former employee, Michael Diggins, who was previously fired for his drug use. Appellant told Ocasio that he "didn't want to put Diggins through the ringer since he had already been fired." Sometime later, Ocasio became aware that Appellant was lying to Ocasio and Willard had never even ordered the cameras. Eventually, Ocasio was suspended in February 2016 and fired from Upland Borough in October 2016.

As aforementioned, Peterson is the administrative assistant for the police department and the current president of Council. During Appellant's term as president, Peterson was Vice-President of Council as well as the secretary for the Police Department. Peterson has known Appellant for approximately thirty years. Peterson saw Appellant quite frequently and often had lunch with him. During her time, Peterson became aware of Willard through Appellant. With regard to the missing dash cameras for the police cars, Peterson was aware that the project was being handled by Logan Solutions although never formally voted on by Council nor taken to a proper bidding process. Peterson became aware that Logan Solutions was paid twice for the cameras, interestingly enough that Logan had been paid the first time for the cameras despite the fact that he had never even ordered them. Peterson told Appellant that the Borough was not going to pay for a second set of cameras. Despite the conversation, Peterson learned that Logan was paid a second time at the direction of Appellant. In addition, when Peterson found out that Ocasio was told not to investigate the missing cameras, she told Ocasio that it was his job as Chief of Police to make the report.

In her capacity as Vice President, Peterson spoke with Appellant several times about her concern that too much money was being spent, that Logan Solutions was bypassing the bidding rules, and was being paid for work that hadn't even been done; Appellant always told Peterson to just do what she was told to do. Appellant told Peterson that the bidding was not an issue because he was having the checks paid in smaller amounts to keep it under the bidding requirements. Eventually, Peterson told Appellant that she had growing concerns because she was signing the checks, to which Appellant responded: "[H]a ha my name isn't on anything." Eventually, Peterson began signing checks cut to Logan Solutions as "CP as per EM." In March 2015, a retirement party was held for Purcival. Appellant told Peterson all of the time that he wanted Purcival gone. At the party, Appellant walked past Peterson and said: "[T]hat's how we do it, kid."

Peterson had no knowledge of the covert camera system or the corresponding microphones.

In January 2016, [Peterson] replaced Appellant as President of Borough Council; Appellant was not happy with the situation. In February 2016, Peterson found a post-it note on her desk; the post-it note had a drawing of eyes and handcuffs and said "sorry" with "you" underneath the eyes. Later that same day, Ocasio arrested Peterson, an arrest that later was found to be without any factual basis or probable cause. Later, emails were uncovered between Ocasio and Appellant, discussing the impending arrest of Peterson.

On March 16, 2016, Willard was interviewed by Detective Kelly and Detective Lythgoe of CID. Willard was asked about the missing cameras. Willard was afraid of getting in trouble, so at that time, he lied. In August 2016, Willard confessed the truth about the cameras to Detective Deery. Willard also told Detective Deery everything that had been going on between him and Appellant and their deal to provide Logan Solutions the work in Upland in exchange for a "kick back" that typically ranged anywhere between ten to fifteen percent. Willard told Detective Deery that Appellant instructed him to break down his invoices into smaller amounts to get around the bidding process. Willard told Detective Deery that the prices of the jobs were often inflated so that more money could be allocated from the Borough and secured that Appellant would receive the cash for the kick back. Detective Deery asked Willard if he would place a call to Appellant and if that call could be recorded; Willard agreed and consented to the recording. During the conversation, Willard repeatedly told Appellant that he was contacted by detectives and that he was nervous that their scheme was going to be uncovered; Appellant always answered with: "[Y]ou were just paying me back the money I loaned you." Willard told Detective Deery that he had never accepted a loan from Appellant. Ultimately, Willard was arrested and pled guilty to several counts of theft-related offenses in connection with the scheme.

At trial, each of the above witnesses were instructed to go through each and every invoice ever submitted by Logan and confirm or deny whether the projects ever went to bid and whether Council ever voted on the bills before they were paid. Each witness

testified that none of the invoices were ever sent to bid nor were the bills ever voted on prior to be paid to Willard.

At trial, Willard testified that he and Appellant had worked out a deal where Willard would cash the checks that he received from the Borough and then he would give a percentage of that cash to Appellant. That percentage depended on the size of the invoice but typically ranged from ten to twenty percent of the value of the check. During his testimony, Willard explained in detail every project he ever was contracted to complete for the Borough, the invoices he submitted, the payments he received, and the percentage of each job that he gave back to Appellant.

Trial Court Opinion, 5/17/19, at 2-13 (with minor stylistic revisions).

In December 2016, Appellant was charged with the offenses listed above. On July 11, 2018, one day before trial, Appellant moved for a continuance, and the trial court denied the motion. The jury returned its verdict after a five-day trial. On September 14, 2018, the court imposed sentence. Appellant filed timely post-sentence motions, which the court denied, and a timely notice of appeal. Both Appellant and the trial court complied with Pa.R.A.P. 1925.

Appellant raises the following issues in this appeal:

I. Was the trial court in error for denying [Appellant's] motion for a continuance when long-requested substantial discovery in excess of one thousand (1000) pages was not provided until five (5) days prior to the start of trial?

II. Was the trial court in error for denying [Appellant's] motion for a mistrial when the Commonwealth asked and elicited testimony from Michael Ciach which amounted to negative character testimony concerning [Appellant] in violation of a pretrial ruling by the court?

III. Was the trial court in error for denying [Appellant's] motion for a mistrial when witness Peterson testified about [Appellant]

threatening people and bringing up a false arrest that Peterson experienced which was so prejudicial that the judge's instruction to strike that answer was not sufficient to cure?

IV. Was the trial court in error at the time of sentencing when the sentencing judge interjected his own personal experience involving local government and verbally mentioning that experience during the time of [Appellant's] sentencing?

V. Was the trial court in error for not permitting all available defense witnesses to testify at the time of sentencing?

Appellant's Brief at 5.

In his first argument, Appellant contends that the trial court abused its discretion by refusing to grant his motion requesting a continuance one day before jury selection. Trial counsel stated that he and his expert witness needed additional time to prepare because (1) two days earlier, the prosecutor provided nearly 1,400 pages of discovery material, and (2) during the previous week, the prosecutor provided a supplemental expert report. The discovery material, however, was Appellant's own bank records. The prosecutor stated that the Commonwealth produced these records in September 2017. The trial court denied the continuance because either the Commonwealth previously provided the records to counsel, or they were readily available to Appellant as his records.

The defendant must move for a continuance not later than 48 hours before the time scheduled for trial. Pa.R.Crim.P. 106(D). The court may grant a continuance "in the interests of justice." Pa.R.Crim.P. 106(A). When the defendant requests a continuance within 48 hours of trial, the court may grant

the request "only when the opportunity [for making the motion] did not previously exist, the defendant was not aware of the grounds for the motion, or the interests of justice require it." Pa.R.Crim.P. 106(D). The trial court must state on the record the reasons for granting or denying the continuance. *Id.* We review the trial court's decision to grant or deny continuances for abuse of discretion. ***Commonwealth v. Brooks***, 104 A.3d 466, 469 (Pa. 2014).

The trial court acted within its discretion by denying Appellant's motion for continuance. The records in question were Appellant's own bank records. As the court observed in its opinion, even if the Commonwealth did not produce these records until shortly before trial, they belonged to Appellant and were always available to him and his attorneys. Trial Ct. Op. at 15; ***see also Commonwealth v. Spotz***, 756 A.2d 1139, 1153-54 (Pa. 2000) (where Commonwealth did not provide transcripts from defendant's prior trials in other counties until first day of trial in the case on appeal, no discovery violation because transcripts were equally available to defense and prosecution). Moreover, Appellant's two attorneys were capable of reviewing the material before or during trial. ***Commonwealth v. Sandusky***, 77 A.3d 663, 672 (Pa. Super. 2013) (defendant's right to effective assistance of counsel not violated by denial of his request for continuance in order for counsel to review voluminous supplemental discovery received close to trial, where defense team was capable of sorting through material while trial was

ongoing). In fact, it appears that Appellant's counsel did review them, because Appellant's expert witness, a forensic accountant, testified that in the course of preparing her opinion, she reviewed five to ten bank statements that she received from trial counsel. Tr., 7/19/18, at 66-67, 88. Accordingly, Appellant's first argument fails.

Next, Appellant asserts that the trial court erred by denying his motion for mistrial during Ciach's trial testimony. The prosecutor asked Ciach, "[W]hat was [Appellant's] power as borough council president?" Tr., 7/16/18, at 147. The witness replied: "[Appellant] controlled everything. Basically, his word was what you did . . ." *Id.* Trial counsel objected that the witness was giving "reputation testimony" and moved to strike. *Id.* at 148-49. The prosecutor explained that the answer was nonresponsive. *Id.* Trial counsel also moved for a mistrial. The trial court sustained the objection, denied the motion for mistrial, struck the testimony, and instructed the jury to disregard the answer, stating, "What the power is and what the perception of it are two different things. Power [is] controlled under the Borough Code[.]" *Id.* at 150.

"A mistrial is an extreme remedy that is required only where the challenged event deprived the accused of a fair and impartial trial." *Commonwealth v. Travaglia*, 28 A.3d 868, 879 (Pa. 2011). "A trial court may grant a mistrial only where the incident upon which the motion is based is of such a nature that its unavoidable effect is to deprive the defendant of a fair trial, preventing the jury from weighing and rendering a true verdict."

*Commonwealth v. Fortenbaugh*, 69 A.3d 191, 193 (Pa. 2013). When the defendant seeks a mistrial based on a witness's testimony, we consider whether the prosecutor deliberately elicited the testimony, the prejudice caused by the testimony, and whether the court gave curative instructions that were adequate to overcome prejudice. *Commonwealth v. Briggs*, 12 A.3d 291, 338-39 (Pa. 2011). We review the denial of a mistrial for abuse of discretion. *Travaglia*, 28 A.3d at 879.

Here, the prosecutor did not deliberately elicit Ciach's testimony that Appellant controlled everything in the borough or that people did what he told them to do. The thrust of the prosecutor's question to Ciach was what statutory powers Appellant had as Council president, not what power he actually exerted or what power people regarded him as having. Further, Ciach's remark was an isolated incident in a trial that covered well over 1,000 pages of testimony, and the Commonwealth did not repeat or exploit it in any fashion. *Commonwealth v. Murphy*, 657 A.2d 927, 934 (Pa. 1995) (defendant not entitled to mistrial when defense witness remarked during cross-examination that defendant was on "death row"; prosecutor did not intentionally elicit remark, but, rather, witness volunteered information and remark was isolated and not repeated or exploited in any way). Finally, the trial court gave a curative instruction that the powers in question were what the Borough Code prescribed, not what people perceived them to be. We presume that jurors follow the court's instructions, *Commonwealth v.*

- 13 -

*Aikens*, 168 A.3d 137, 143 (Pa. 2017), and Appellant gives us no reason to believe that the jury disregarded the present instruction. Accordingly, Appellant's argument fails.

Third, Appellant argues that the court erred by failing to grant a mistrial based on Peterson's testimony that she was afraid to confront Appellant. The prosecutor asked: "Were you afraid to go against [Appellant]?" Tr., 7/17/18, at 156. Peterson answered: "Absolutely . . . Because if you did then he threatened people . . . I got falsely arrested or he did some report to where it probably looked like there was something going on in the police department. Or he threatened my 73-year-old mother that it would be [a shame] if she didn't have anywhere to live[.]" *Id.* at 156-57. Trial counsel objected, moved to strike and requested a mistrial. The trial court denied the motion for mistrial but instructed the jury to disregard the answer. *Id.* at 157-58. Subsequently, the court emphasized that the jury was required to "accept and follow" the court's "rulings and instructions" on matters of law. Tr., 7/20/18, at 5.

The court properly denied Appellant's motion for mistrial. Like Ciach's remark discussed above, Peterson's testimony did not prejudice Appellant, because it was an isolated incident in a lengthy trial, the court instructed the jury to disregard Peterson's answer, and there is no reason to believe that the jury ignored the court's instruction. Furthermore, Peterson's statement was cumulative of other testimony, admitted without objection, that Appellant was

feared in Upland Borough. *See* Tr., 7/16/18, at 343 (Purcival's testimony that she processed invoices at Appellant's direction because she was afraid of termination if she did not do so); 354 (Purcival: "people were afraid of retaliation if they went against what [Appellant] wanted"); 355 (Purcival: "[Appellant] had a saying. He would always say, I'm going to get them and that means that that person would be terminated, which he did several employees and he was not pleasant about it. I sat in on one of them"); Tr., 7/17/18, at 144 (Peterson: "you didn't go against [Appellant]. Everyone was afraid of him. If you didn't do what he said you paid"); *see generally* ***Commonwealth v. Young***, 748 A.2d 166, 176 (Pa. 1999) (although testimony might have been improper, "it was merely cumulative of other evidence concerning defendant's [fraudulent] scheme and had no effect on the jury's verdict").

In his next argument, Appellant contends that the court imposed an excessive sentence by relying on an impermissible factor, its own experience in Borough government. We disagree.

During sentencing, Appellant's attorney objected to the Commonwealth's recommendation of a prison sentence of six to forty-two years by emphasizing that Appellant was elderly and in poor health, had no prior convictions and that other criminals did not receive sentences that high:

> At his age, that's essentially a life sentence. Drug dealers don't get sentences that high. Robbers don't get sentences that high. People who are convicted of aggravated assault don't get sentences that high. There was a woman . . . who was employed

by the District Attorney's Office who stole money from the District Attorney's Office. I believe it was $700,000-some. I think her sentence, the maximum sentence that she received was on 27 months.

N.T., 9/14/18, at 20. The court responded:

Let me just tell you my perspective's a little different than most. I served eight years as a president of Borough Council. I served six years as a township commission, two of those as president. So, I have a very good understanding of what the role of an elected official in a local municipality. That's a perspective that I see and have dealt with first hand for fourteen years. So, I know what's expected of an elected official, so I've taken that into consideration just so that you understand.

N.T., 9/14/18, at 22. Counsel stated: "I do, Judge. I'm not suggesting that you not take that into consideration, but I'm also urging that the Court look at the mitigating factors in this case too -- my client's age and his poor health and lack of prior record." *Id.* The court answered: "I have looked at all of the factors, believe me." *Id.*

This argument relates to the discretionary aspect of Appellant's sentence. Where an appellant challenges the discretionary aspect of a sentence, we must determine:

(1) whether the appeal is timely; (2) whether Appellant preserved his issue; (3) whether Appellant's brief includes a concise statement of the reasons relied upon for allowance of appeal with respect to the discretionary aspects of sentence [pursuant to Rule of Appellant Procedure 2119(f), Pa.R.A.P. 2119(f); and (4) whether the concise statement raises a substantial question that the sentence is [not] appropriate under the [S]entencing [C]ode.

*Commonwealth v. Williams*, 198 A.3d 1181, 1186 (Pa. Super. 2018). Here, defense counsel arguably waived any objection to the court's comment by

- 16 -

stating during sentencing, "I'm not suggesting that you not take [the court's knowledge of the role of borough officials] into consideration." In addition, defense counsel failed to comply with Pa.R.A.P. 2119(f)'s requirement to include a concise statement of the reasons relied upon for allowance of appeal with respect to the discretionary aspects of sentence in his brief. Nevertheless, we decline to find waiver. We note that Appellant complied in substantial part with the four-part test for preserving this issue for appeal. He filed a timely appeal, objected to the court's comment in a post-sentence motion, and raised a substantial question by asserting that the court relied on an improper sentencing factor. *Commonwealth v. Peck*, 202 A.3d 739, 746 (Pa. Super. 2019). Furthermore, we find it important that the Commonwealth did not argue in its appellate brief that Appellant waived this issue. We have held that "in the absence of any objection from the Commonwealth, we are empowered to review claims that otherwise fail to comply with Rule 2119(f)." *Commonwealth v. Gould*, 912 A.2d 869, 872 (Pa. Super. 2006). The question is even closer here, because Appellant not only ran afoul of Rule 2119(f) but appeared to concede the issue through counsel's statement at sentencing. Nevertheless, based on both our preference for resolving issues on their merits and the Commonwealth's failure to object, we choose to address Appellant's sentencing issue.

> Turning to the substance of Appellant's argument,
>
> [s]entencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal

absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

When imposing a sentence, the sentencing court is required to consider the sentence ranges set forth in the Sentencing Guidelines, but i[s] not bound by the Sentencing Guidelines.... A court may depart from the guidelines "if necessary, to fashion a sentence which takes into account the protection of the public, the rehabilitative needs of the defendant, and the gravity of the particular offense as it relates to the impact on the life of the victim and the community." When a court chooses to depart from the guidelines however, it must "demonstrate on the record, as a proper starting point, his awareness of the sentencing guidelines." Further, the court must "provide a contemporaneous written statement of the reason or reasons for the deviation from the guidelines.

When reviewing a sentence outside of the guideline range, the essential question is whether the sentence imposed was reasonable. An appellate court must vacate and remand a case where it finds that "the sentencing court sentenced outside the sentencing guidelines and the sentence is unreasonable." 42 Pa.C.S.[ ] § 9781(c)(3).

*Peck*, 202 A.3d at 746.

When reviewing the record, Section 9781 requires that we consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the opportunity of the sentencing court to observe the defendant, including any presentence investigation; (3) the findings upon which the sentence was based; and (4) the guidelines promulgated by the commission. 42 Pa.C.S.A. § 9781(d). "[A] sentence may be found to be unreasonable after review of Section 9781(d)'s four statutory

factors." ***Peck***, 202 A.3d at 746. A sentence may also be unreasonable if it was imposed "without express or implicit consideration" of the protection of the public, the rehabilitative needs of the defendant, and the gravity of the particular offense as it relates to the impact on the life of the victim and the community as required by 42 Pa.C.S.A. § 9721(b). ***Id.*** at 746-47. "Where a [pre-sentence investigation report] exist[s], we [] presume that the [trial court] was aware of relevant information regarding the defendant's character and weighed those considerations along with mitigating statutory factors. A [PSI] constitutes the record and speaks for itself." ***Commonwealth v. Antidormi***, 84 A.3d 736, 761 (Pa. Super. 2014).

In this case, the court reviewed the parties' sentencing memoranda and the pre-sentence investigation report, N.T., 9/14/18, at 41, and it comprehensively explained its reasons for imposing a sentence of imprisonment, stating:

> At the time this investigation commenced, you served as president of Upland Borough Council. As council president, you set the agenda and chaired the council meetings. That was the full extent of your statutory authority. The remainder is vested in the council as a whole or the mayor. As to the police department, it is the mayor who oversees it on a day-to-day basis and not you as president of council. Upland had a borough manager who was responsible for the day-to-day activities of the staff and who carried out the policies adopted by the council, and you were not the micromanager. Unfortunately, as the testimony clearly demonstrated, you usurped much of this responsibility and authority through threats, bullying, and intimidation. As the testimony unfolded in this case, I was astounded at your arrogance and self-righteousness. You exhibited total disdain for the mayor or the other members of council, the Borough employees, and the people of Upland. Much like a child predator,

you slowly groomed these somewhat naive and trusting persons into thinking you had the best interest of the Borough at heart. As a result, council, to its detrimental reliance, abdicated much of its responsibility and oversight. You [d]evolved into a ruthless dictator who took revenge on anyone who had the audacity to question your actions . . . You are a thief. You stole from the taxpayers under the guise of being Robin Hood, except you were the recipient of the alleged benevolence. You are greedy. You are pompous. You violated your oath of office, you denigrated the position of borough councilman, you defamed the Borough of Upland, and you made fools of the electorate. Having read the Pre-Sentence Investigation Report, I was floored when I read the following and I quote, "[Appellant] denied any wrongdoing. He claimed anything that was paid council approved. He denied receiving any money or kickbacks from anyone." This is pure baloney. In your statement to the detectives, you admit you got money.

*Id.* at 41-44. The court determined that Appellant did not deserve lenience due to his age (76) or poor health because he showed no remorse and undercut the faith of the electorate. *Id.* at 44. The record fully supports all of the court's points. Its careful and extensive assessment of Appellant's conduct demonstrates that its sentencing decision was the product of careful and sober deliberation.

We do not think that the trial court considered an improper sentencing factor by mentioning that it had served as a borough official before taking the bench and knew what was expected of borough officials. Appellant interprets this remark to mean that the court arrived at its sentence by subjectively factoring in its own experience as a borough official. We construe the court's comment differently. The court made this remark in response to defense counsel's claim that Appellant deserved a more lenient sentence than robbers

and other violent offenders. The court merely intended to convey, in so many words, that it understood the role of borough officials and could ascertain when crimes committed in public office were as serious as robberies or assaults. Viewed in this context, the court's remark was permissible under Section 9721(b) to reflect its grasp of the impact of Appellant's offenses on the community.

In his final argument, Appellant complains that the court abused its discretion by limiting the number of character witnesses at sentencing to three: Appellant's wife and daughter and a veterinarian who posted Appellant's pre-trial bail.[2] We see no abuse of discretion.

The admissibility of evidence, including sentencing evidence, rests with the sound discretion of the trial court. *Commonwealth v. King*, 182 A.3d 449, 455, (Pa. Super. 2018). Just as courts may limit the number of character witnesses during trial when additional testimony would be cumulative, *Commonwealth v. Owens*, 649 A.2d 129, 136 (Pa. Super. 1994) (court properly limited defendant to three reputation witnesses), so, too, was it permissible for the trial court to restrict Appellant to three character witnesses during sentencing, since Appellant failed to demonstrate that the additional witnesses would have said something new or different in Appellant's favor.

For these reasons, we affirm Appellant's judgment of sentence.

---

[2] Defense counsel had five other persons stand up who were ready and willing to speak on Appellant's behalf.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>12/14/19</u>